[S. F. No. 22529.   In Bank.   Oct. 10, 1967.]

JERROLD F. VISTICA et al., Plaintiffs and Appellants, v. PRESBYTERIAN HOSPITAL AND MEDICAL CENTER OF SAN FRANCISCO, INC., Defendant and Respondent.

466

Clausen & Clausen and Henry C. Clausen for Plaintiffs and Appellants.

Clark, Heafey & Martin, Chris G. Gasparich and Gerald P. Martin for Defendant and Respondent.

McCOMB, J.—Plaintiffs appeal from a judgment in favor of defendant, after trial before a jury, in a wrongful death action.

*Facts*: Plaintiffs are the deceased's husband, individually, and her minor children by their guardians ad litem, their father and grandmother.

The decedent, Lorraine Vistica, was a mentally ill person. The testimony of witnesses describes her as one who possessed a schizophrenic personality and was paranoid and strongly motivated toward suicide.

On August 5, 1961, while at home, Lorraine stabbed herself in the chest. She was admitted to the psychiatric ward of defendant hospital and there came under the care of Dr. Cartwright. The doctor recognized Lorraine's potential for self-destruction and ordered that ward personnel observe precautions against her suicide.

She remained at the hospital until September 8, 1961, when she was permitted to go home to spend the daytime hours with

her family. She did not make satisfactory progress at home, and while on this schedule engaged in at least one alarming incident that suggested her continued motivation to suicide.

On October 19, 1961, she was readmitted to the hospital for full-time care, and Dr. Cartwright again ordered that hospital personnel take precautions against her suicide. Her tendencies toward elopement were also described in her doctor's notes and conveyed to and noted by the nurses on the psychiatric ward.

At the trial, both sides offered testimony as to the meaning of the terms "suicide precautions" and "elopement precautions." Although different witnesses described their understanding of these terms in varying ways, a fair summary of their testimony is that the first term means that increased vigilance must be used in the care of a patient such as Lorraine, while the latter term means that the patient is to be carefully observed and the door of the ward watched to see that the patient does not flee the hospital.

The psychiatric ward where the deceased was a patient was operated on the "open ward" pattern, presently considered best for psychiatric patients. In such a ward, patients are relatively free from restraint. Lorraine's doctor considered it particularly important that she not feel imprisoned. Because of her relative freedom, the need for suicide and elopement precautions was particularly evident to her doctor.

The psychiatric ward had a kitchen, a nurses' station, and a solarium, as well as sleeping rooms for the patients. The furniture in the solarium included a radio console, light wooden chairs, and a metal wastebasket. The windows in the solarium were divided into two sections, a lower one, which was fixed shut, and an upper one, transom-like, which could be opened. The upper portion of each window was fitted with chains and a metal strap, which prevented the window from opening wide. On one window, however, the chains had not been knotted up short. As a result, that window could be opened considerably farther than the others. The solarium was three floors above street level.

On October 29, 1961, Mrs. Miller, Lorraine's mother, visited Lorraine and found her in the solarium. There was dust on Lorraine's dress. Mrs. Miller saw the radio console beneath the window that could be opened widest. The transom was open; a chair was on top of the console; and the metal wastebasket had been placed on top of the chair. Lorraine indicated that she had arranged the furniture as it was found. Mrs.

Miller reported these events to the nurse on duty and also to Dr. Cartwright, who said he would order 24-hour surveillance for Lorraine. Other nurses on the ward and a hospital orderly were also informed of the occurrence.

The next day Dr. Cartwright saw Lorraine at the hospital and questioned her about the furniture pile-up in the solarium. She denied any participation in the incident, but at the same time the doctor found her angry, tense, and desirous of returning home. Later, Lorraine's mother arrived, and she, too, found her daughter angry and demanding to be permitted to go home. Dr. Cartwright refused permission for his patient to leave the hospital.

At 4 p.m. Dr. Cartwright warned nurses on the ward of Lorraine's emotional state and that she might attempt to escape that evening. He requested that they observe her carefully and that she not be left alone.

At 5 p.m. Lorraine had dinner in her room, and afterward lay down on her bed. About 5:30 p.m. an orderly came to her room and invited her to play cards in the solarium. She replied that she would be there in a few minutes. At 5:50 p.m. the orderly was sent to another floor of the hospital, leaving the solarium unattended for approximately eight minutes. At that time one of the nurses was on her "dinner break," and the only nurse on the ward was engaged with the other patients at her station at the opposite end of the hall.

At 5:58 p.m. the ward nurse received a telephone call from an unidentified person who said that a girl's body was lying on the ground, beneath a window of the psychiatric ward, on the Webster Street side of the hospital. A quick search of the ward disclosed the absence of a patient.

In the solarium, the radio console stood beneath the window that opened the widest. On top of the console was a wooden chair, and above that, the metal wastebasket. The girl in the street was Lorraine. She was dead.

▮▮▮▮ Question: *Was it prejudicially erroneous for the trial court to instruct the jury that in order for plaintiffs to be entitled to the benefit of the res ipsa loquitur doctrine, the jury had to find that the decedent's death was not due to any voluntary action or contribution on her part?*

*Yes.* Although the instruction given[1] meets the require-

---

[1]The trial court instructed: "You must decide the following questions concerning the death involved in this case:

"Whether the death is one which ordinarily does not occur in the absence of negligence.

"Whether the death is one which ordinarily does not occur in the

ments set forth by this court in *Ybarra* v. *Spangard*, 25 Cal. 2d 486, 489 [1] [154 P.2d 687, 162 A.L.R. 1258], to wit: (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; and (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff—an instruction must be measured by the circumstances of the case in which it was given. (*Adams* v. *American President Lines*, 23 Cal.2d 681, 688 [11] [146 P.2d 1]; *Schroeder* v. *Baumgarteker*, 202 Cal. 626, 629 [262 P. 740].)

The circumstances here are that a mentally ill patient was confined for care and treatment in the psychiatric ward of defendant hospital; the duty imposed by law on the hospital is that it must exercise such reasonable care toward a patient as his mental and physical condition, if known, require; the duty extends to safeguarding the patient from dangers due to mental incapacity; and where the hospital has notice or knowledge of facts from which it might reasonably be concluded that a patient would be likely to harm himself or others unless preclusive measures were taken, then the hospital must use reasonable care in the circumstances to prevent such harm. (*Wood* v. *Samaritan Institution, Inc.*, 26 Cal.2d 847, 851 [2] [161 P.2d 556].)

The jury was properly instructed that the hospital's duty was to exercise the amount of caution and attention measured by Lorraine's known condition and that she was not contributively negligent.

The jurors were also instructed that they were permitted to draw an inference of defendant's negligence if they found that Lorraine's death was "caused while she was exclusively

---

absence of negligence is to be determined from all of the evidence presented in this trial and according to my instructions regarding the standard of care.

"Did the death occur while Lorraine Vistica was exclusively under the physical care or control of the defendant Presbyterian Hospital in its psychiatric ward, immediately prior to her death and while she was a patient therein.

"Was the death due to any voluntary action or contribution on the part of decedent.

"If, and only if, you find that Lorraine Vistica's death was of a kind which ordinarily does not occur in the absence of negligence, was caused while she was exclusively under the physical care or control of the defendant Presbyterian Hospital in the psychiatric ward as a patient therein, and was not due to any voluntary action or contribution by Lorraine Vistica, you will be guided in determining the issue of liability of defendant Presbyterian Hospital by the following instructions. . . ."

under the physical care or control of the defendant hospital in the psychiatric ward as a patient and was not due to any voluntary action or contribution by Lorraine.''

■ The requirement that the plaintiff account for his own conduct before it can be said that the injury was more probably than not the result of the defendant's negligence was explained in *Zentz* v. *Coca Cola Bottling Co.,* 39 Cal.2d 436, 444-445 [8-9] [247 P.2d 344], as follows: ''Some cases have stated that the accident must not have been due to any voluntary action or contribution on the part of the plaintiff. [Citations.] This is allied to the condition of control by the defendant and has also been employed as a means of showing that the defendant, rather than the plaintiff, had control and was responsible for the injury. [Citation.] It should not be confused with the problem of contributory negligence, as to which defendant has the burden of proof, and its purpose, like that of control by the defendant, is merely to assist the court in determining whether it is more probable than not that the defendant was responsible for the accident. . . . a plaintiff may properly rely upon res ipsa loquitur even though he has participated in the events leading to the accident if the evidence excludes his conduct as the responsible cause. [Citation.]'' And, as Professor Prosser states: ''But the requirement [absence of any action on the part of the plaintiff contributing to the accident] may easily be misunderstood. The plaintiff is seldom entirely static, and it is not necessary that he be completely inactive, but merely that there be evidence removing the inference of his own responsibility.'' (Prosser on Torts (3d ed. 1964) § 39, pp. 228-229; *Shahinian* v. *McCormick,* 59 Cal.2d 554, 560 [6] [30 Cal.Rptr. 521, 381 P.2d 377].)

For example, in *Rose* v. *Melody Lane,* 39 Cal.2d 481, 486 [4b] [247 P.2d 335], a patron in a bar voluntarily sat on a bar stool that was defective, but his ''voluntary conduct'' was not the responsible cause for his fall when the stool collapsed. Similarly, in *Di Mare* v. *Cresci,* 58 Cal.2d 292, 299 [9] [23 Cal.Rptr. 772, 373 P.2d 860], a tenant who voluntarily used a common stairway, which the lessor had a duty of reasonable care to maintain in a safe condition, was not the responsible cause of her injury when a step collapsed.

■ It was not sufficient for the court to instruct the jury with respect to the third requirement set forth in the instruction (that if the decedent's death was due to any voluntary action or contribution on her part, plaintiffs were not entitled

to the benefit of the res ipsa loquitur doctrine) without explaining that Lorraine's voluntary conduct had to be the responsible cause of her death. The jury might have misunderstood the requirement to mean that Lorraine's voluntary participation in her own attempted escape, and resultant death, precluded an inference that it was more probable than not that the hospital breached its duty of care to protect her from her own actions, voluntary or involuntary.

Where it seems probable that the jury's verdict may have been based on the erroneous instruction, prejudice appears, and this court should not speculate upon the basis of the verdict. (*Robinson* v. *Cable*, 55 Cal.2d 425, 428 [4] [11 Cal.Rptr. 377, 359 P.2d 929].)

The judgment is reversed.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied November 8, 1967.