215 N.J. Super. 484 (1987)
522 A.2d 444
MARILYN M. COWAN, FORMERLY KNOWN AS MARILYN M. LOMBARDO, PLAINTIFF-RESPONDENT,
v.
RICHARD DOERING, M.D., ALEXANDRE ACKAD, M.D., KATHLEEN BARLICS, R.N., CAROLE ELTRIDGE, R.N., AND THE VALLEY HOSPITAL, DEFENDANTS-APPELLANTS, AND ALLWYN J. LEVINE, M.D., LOIS PAPP, R.N., CHRIS TAYLOR, R.N., SHARON KROLL, R.N., MARY DOE, JANE DOE, BETTY DOE AND NANCY DOE, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Argued December 16, 1986.
Decided January 15, 1987.
*486 Before Judges PRESSLER, BAIME and ASHBEY.
John P. Markey argued the cause for defendant-appellant Richard Doering (Markey, Dailey & Cagney, attorneys; John P. Markey, on the brief).
James B. Sharp argued the cause for defendant-appellant Alexandre Ackad (Conway & Reiseman, attorneys; James B. Sharp, of counsel; M. Arthur Arnold, on the brief).
*487 Peter R. Feehan argued the cause for defendants-appellants Valley Hospital and Carole Eltridge (Feehan & Feehan, attorneys; Peter R. Feehan, on the brief).
William B. Butler argued the cause for plaintiff-respondent (Hooley, Butler, DiFrancesco & Kelly, attorneys; William B. Butler, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Following a lengthy jury trial, plaintiff was awarded $600,000 in compensatory damages for injuries sustained when she jumped from a second-story window while being treated at Valley Hospital for an overdose of sleeping pills. Drs. Richard Doering and Alexandre Ackad, nurses Carole Eltridge and Kathleen Barlics and Valley Hospital filed separate appeals from the judgment. Barlics' appeal was subsequently dismissed for procedural reasons which need not be recited. We consolidated the remaining appeals and now affirm.
Plaintiff's action against Dr. Ackad, nurses Eltridge and Barlics and Valley Hospital was premised primarily on their failure to take appropriate precautionary steps to prevent her from attempting to commit suicide. Dr. Ackad was the treating physician and nurses Eltridge and Barlics were assigned to the intensive care unit when plaintiff was admitted. It is undisputed that plaintiff had a history of suicidal acts having overdosed on two prior occasions. Plaintiff contended that Dr. Ackad was negligent in failing to order a "suicide watch"[1] and in not taking other measures to safeguard her from self-inflicted injury. Plaintiff's claim against nurses Eltridge and Barlics was predicated on allegations that they failed to properly monitor her condition and prevent her from committing self-destructive acts. The negligence of Dr. Doering was premised *488 essentially upon his having improperly dispensed sleeping pills to plaintiff knowing that she harbored suicidal propensities.
The essential facts are largely undisputed. Plaintiff first became acquainted with Dr. Doering when she commenced her employment with Valley Hospital. Plaintiff, a registered nurse, was assigned to the intensive care unit. Dr. Doering was a general and vascular surgeon at the hospital. At the time they met, plaintiff and Dr. Doering were both married, but were experiencing severe marital problems. Their relationship rapidly developed into a "romantic attachment," but the couple did not engage in intercourse because of Dr. Doering's impotency. Although they discussed marriage, Dr. Doering never expressly promised that he would leave his wife. Nevertheless, plaintiff testified that Dr. Doering led her to believe that he would eventually marry her.
As their relationship progressed, plaintiff became increasingly anxious and depressed. Pursuant to Dr. Doering's recommendation, plaintiff visited a gynecologist who prescribed nembutal, a strong sedative. On April 10, 1981 plaintiff was extremely depressed and attempted to commit suicide by swallowing a large quantity of the prescribed pills. Plaintiff was immediately transported to Valley Hospital where she was placed under the care of Dr. Ackad. Although plaintiff never became violent during her hospitalization, it is undisputed that she attempted to disconnect the intravenous tubes and remove herself from chest and wrist restraints. Aware of these developments and the reason for plaintiff's admission, Dr. Ackad called for a psychiatric consultation with Dr. Allwyn Levine.
Following her discharge on April 12, 1981, plaintiff continued under the care of Dr. Levine on an out-patient basis. During this period, plaintiff received psychotherapy twice each week. Dr. Levine decided against prescribing anti-depressant drugs because he believed that plaintiff was "unreliable" and harbored a "potential to overdose."
*489 Plaintiff and Dr. Doering continued their illicit relationship. Although Dr. Doering was aware that plaintiff was being treated by Dr. Levine, the couple discussed the subject "only in the vaguest sense." Plaintiff continued to experience anxiety and sleeplessness. On several occasions, she asked Dr. Doering for nembutal. Initially, Dr. Doering refused but he subsequently relented. According to plaintiff's testimony, Dr. Doering gave her a prescription for nembutal which she destroyed. She testified that he subsequently gave her a bottle containing ten nembutal pills. Dr. Doering denied having provided plaintiff with the medication. He admitted, however, that he had given her a prescription for a small quantity of nembutal pills. Dr. Doering testified that he prescribed the medication because he was concerned that plaintiff's insomnia "might hinder" the progress of her psychiatric treatment.
As noted previously, Dr. Doering had been impotent for some period of time. However, on June 23, 1981, Dr. Doering was able to have an erection and the couple engaged in intercourse. Plaintiff believed that the event was significant and might ultimately precipitate a decision by Dr. Doering to leave his wife. On the following morning, plaintiff telephoned Dr. Doering and mentioned that she was considering moving to her parents' home in Connecticut. Contrary to plaintiff's expectation, Dr. Doering made no attempt to dissuade her but rather suggested that such a course was the "correct one" and would "be best for all of us." Dr. Doering also told plaintiff that he would not leave his wife.
On the next morning, plaintiff locked the doors to her house and swallowed ten nembutal pills. According to plaintiff, she was "desperate" and wanted to die. After ingesting the pills, plaintiff telephoned Dr. Doering who immediately contacted the police. Plaintiff was transported to Valley Hospital where she was again placed under the care of Dr. Ackad.
We need not fully describe the course of plaintiff's treatment in the intensive care unit. Restraints were placed on plaintiff's *490 chest and wrists. In addition, plaintiff was "hooked up to a cardiac monitor" which had a screen at the central nurse's station. If the patient were to disengage herself from this device, the screen would "show a straight line" and an alarm would sound. Although plaintiff initially appeared extremely lethargic, she subsequently became agitated and attempted to remove the restraints and disconnect the intravenous tubing. While aware of these developments, Dr. Ackad did not order a suicide watch. According to his testimony, he believed that such a course was unnecessary because plaintiff's bed railing was up, restraints had been placed on her chest and wrists, her door was open and she was in the direct line of the nurses' vision.
At approximately 10 p.m., Dr. Doering appeared in plaintiff's room and ordered Barlics, the attending nurse, to leave. Although the door to plaintiff's room had been opened at the time, Dr. Doering closed it after Barlics left. Barlics proceeded to the adjoining room where she and Eltridge treated another patient. When Barlics heard the door to plaintiff's room close, she assumed that Dr. Doering had departed. Upon entering the room, she noticed that plaintiff's bed was empty. She called for Eltridge, who ran into the room, saw an open window and heard moaning from outside. Plaintiff was found lying on the ground two stories below. She had apparently jumped from the open window and had sustained severe personal injuries.
Much of the evidence presented at trial pertained to plaintiff's mental or emotional illness. All of the experts substantially agreed that plaintiff suffered from a "borderline personality syndrome." This condition is characterized by extreme "impulsivity or unpredictability," a pattern of unstable and intense interpersonal relationships exhibited by "marked shifts in attitude, devaluation and manipulation," inappropriate and intense anger and frequent displays of temper, depression, irritability and anxiety, and "physically self-damaging acts such *491 as suicidal gestures, self-mutilation or recurrent accidents or fights."
While all of the experts concurred in this diagnosis, they expressed substantial disagreement regarding the genuineness of plaintiff's attempts to commit suicide. Dr. Seymour Kuvin testified that plaintiff was suicidally depressed when she ingested the nembutal pills and when she jumped from the window of the intensive care unit. He viewed plaintiff's conduct as a genuine attempt to commit suicide. Defendants' expert, Dr. Ari Kiev, testified that plaintiff did not seriously intend to kill herself when she ingested the pills and when she jumped from the second-story window. He characterized these acts as "manipulative" conduct designed to seek attention.
Defendants Doering, Ackad and Valley Hospital, through its employees Barlics and Eltridge, were all found negligent. The jury awarded $600,000 to plaintiff and apportioned fault among the various defendants as follows: Dr. Doering, 50%; Dr. Ackad, 35%; Barlics, 5%; Eltridge, 10%. Judgment was entered accordingly and these appeals followed.

I
The principal argument advanced by all defendants is that the trial judge erred when he refused to instruct the jury on plaintiff's negligence. The question of contributory negligence had been raised at the pretrial conference and was designated in the pretrial order as one of the issues to be determined at trial. At the conclusion of the evidence, however, the trial judge found that there was no warrant for submission of the question of contributory negligence to the jury. More specifically, the judge determined that no reasonable trier of fact could find contributory negligence based upon the evidence presented. Since plaintiff's suicidal conduct constituted one of the very symptoms for which she was being treated, the judge refused to submit the defense of contributory negligence to the jury. Rather, the judge viewed the issue of plaintiff's suicidal *492 behavior only in the context of its foreseeability to defendants. In that regard, the trial judge instructed the jury that the causal relationship between a tortfeasor's wrongful act and the injuries that follow could be broken by an "intervening" and "independent agency." The judge further explained that plaintiff could not recover damages for her injuries if her suicidal behavior was not reasonably foreseeable under the circumstances presented.
Our thorough review of the record convinces us that the trial judge correctly refused to submit the question of plaintiff's negligence to the jury. Of course, we recognize that "ordinarily the issue [of contributory negligence] is one for the fact finding tribunal" and "[s]uch is the case where different minds may reasonably come to different conclusions...." Battaglia v. Norton, 16 N.J. 171, 179 (1954). See also Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 222 (1954); Mellon v. Pennsylvania-Reading Seashore Lines, 7 N.J. 415, 422 (1951). The rule is that "where it is reasonably debatable as to whether or not the plaintiff exercised a degree of care commensurate with the risk of harm, the issue of contributory negligence is one for the trier of the facts." Gudnestad v. Seaboard Coal Dock Co., supra, 15 N.J. at 222. Nevertheless, "contributory negligence is an affirmative defense to be proved," Battaglia v. Norton, supra, 16 N.J. at 179, and it is fundamental that there must be evidence in the record from which a legitimate inference of plaintiff's fault may be drawn. "Bald assumption and speculation are not enough." LaMorgese v. Kern-O-Mix, Inc., 82 N.J. Super. 581, 586 (App.Div. 1964). "Nor is a bare scintilla of evidence sufficient to carry to the jury the issue of negligence or its causal relation to the damage suffered." Ibid. "Where an absence of contributory negligence clearly and conclusively appears as a fact or by necessary conclusive inference from an undisputed fact ... [the issue should not be submitted] to the jury for its determination." Kaufman v. Pennsylvania Railroad Co., 2 N.J. 318, 324 (1949).
*493 Although it has been said that the defense of contributory negligence is "fully applicable" in medical malpractice actions, see Flynn v. Stearns, 52 N.J. Super. 115, 121 (App.Div. 1958), additional difficulties are often presented. Therefore, we have long acknowledged that "the general rules relating to contributory negligence must be sharpened considerably when applied to medical malpractice cases...." Id. at 122. That observation has particular efficacy where, as here, the duty of the physician and the hospital encompasses the responsibility to safeguard the patient from the reasonably foreseeable risk of self-inflicted harm.
We have found no reported New Jersey decision dealing with the precise issue presented. The issue has received somewhat uneven treatment elsewhere. See Annotation, "Liability of Hospital Other Than Mental Institution, For Suicide of Patient," 60 A.L.R.3d 880, 886-887 (1974); Annotation, "Contributory Negligence of Mentally Incompetent or Mentally or Emotionally Disturbed Person." 91 A.L.R.2d 392 (1963).
Many jurisdictions have analyzed the problem in terms of the patient's competency. Kanayurak v. North Slope Borough, 677 P.2d 893, 898 n. 10 (Sup.Ct. of Alaska 1984); De Martini v. Alexander Sanitarium, Inc., 192 Cal. App.2d 442, 446-448, 13 Cal. Rptr. 564, 566-567 (App.Ct. 1961); Vistica v. Presbyterian Hospital & Medical Center, 57 Cal. Rptr. 793, 797 (App.Ct. 1967), vacated, 67 Cal.2d 465, 62 Cal. Rptr. 577, 432 P.2d 193 (Sup.Ct. 1967); Noel v. McCaig, 174 Kan. 677, 258 P.2d 234, (Sup.Ct. 1953); Lawrence v. Bamberger R.R., 3 Utah 2d 247, 282 P.2d 335 (Sup.Ct. 1955). Under this standard, the question of plaintiff's negligence is to be submitted to the jury unless the patient was "so mentally ill as to be devoid of reason," Vistica v. Presbyterian Hospital & Medical Center, supra, 57 Cal. Rptr. at 797, or if he was "incapacitated," De Martini v. Alexander Sanitarium, Inc., supra, 192 Cal. App.2d at 447, 13 Cal. Rptr. at 567, or was otherwise "unable to resist temptation." Kanayurak v. North Slope Borough, supra, 677 P.2d at 898 n. 10.
*494 Other jurisdictions have focused attention upon the degree to which the patient's illness has deprived him of the ability to perceive and appreciate the risks attendant to his conduct. City of Belen v. Harrell, 93 N.M. 601, 604, 603 P.2d 711, 714 (Sup.Ct. 1979); Mochen v. State, 43 A.D.2d 484, 486-487, 352 N.Y.S.2d 290, 293-294 (App.Div. 1974); Young v. State, Dept. of Soc. Serv., Dept., Etc., 92 Misc.2d 795, 797, 401 N.Y.S.2d 955, 957 (Ct.Cl. 1978); Warner v. Kiowa County Hospital Authority, 551 P.2d 1179, 1190 (Okla. App.Ct. 1976); Hunt v. King County, 4 Wash. App. 14, 22, 481 P.2d 593, 598 (1971). These jurisdictions have recognized that "[w]ithin the broad spectrum of scientifically differentiated mental illnesses, there are intermediate levels of disability which may interfere with the perception of danger or the free exercise of judgment ... to such a degree that a mentally sick plaintiff suffering [from] such an infirmity should be excused from responsibility for his own injury." Mochen v. State, supra, 43 A.D.2d at 487, 352 N.Y.S.2d at 293. Under this standard, "[t]he disability may fall short of psychosis or severe retardation and the act may be a voluntary judgment by the patient but still be the product of impulse or irrational behavior beyond his control." Ibid. These courts have reasoned that under such circumstances a plaintiff should not be held to any greater degree of care for his own safety than that which he is capable of exercising. Ibid.
We find no sound reason to adopt the sterile and unrealistic approach that if a disabled plaintiff is not totally incompetent, he is fully legally accountable for his own negligence. In view of the present state of medical knowledge, it is possible and practical to evaluate the degrees of mental acuity and correlate them with legal responsibility. Annotation, "Liability of One Causing Physical Injuries as a Result of Which Injured Party Attempts or Commits Suicide," 77 A.L.R.3d 311, 315 (1977). In our view, a patient known to harbor suicidal tendencies whose judgment has been blunted by a mental disability should not have his conduct measured by external standards applicable to a normal adult. Where it is reasonably *495 foreseeable that a patient by reason of his mental or emotional illness may attempt to injure himself, those in charge of his care owe a duty to safeguard him from his self-damaging potential. This duty contemplates the reasonably foreseeable occurrence of self-inflicted injury regardless of whether it is the product of the patient's volitional or negligent act. Cf. Brown v. United States Stove Co., 98 N.J. 155, 166-177 (1984). It is appropriate as a matter of public policy that an injured party should be compensated for a defendant's failure to take precautionary steps commensurate with the risk of self-inflicted harm based upon standards of "what an ordered society requires in the way of care toward others." Mochen v. State, supra, 43 A.D.2d at 488, 352 N.Y.S.2d at 294. It is not appropriate that an injured party's recovery right should be affected by objective notions of care not related in any way to his ability to avoid fault.
Any other rule would render meaningless the duty of the hospital to protect the patient against self-inflicted harm. "The rule would in the same breath both affirm and negate the duty undertaken or imposed by law." Hunt v. King County, supra, 4 Wash. App. at 22, 481 P.2d at 598. The tortfeasor could become indifferent to the performance of his duty knowing that the very eventuality that he is obliged by law to prevent would, upon its occurrence, relieve him from responsibility. In our view, compelling public policy considerations militate against such dilution of the duty of the hospital and physician to safeguard the patient from a reasonably foreseeable self-inflicted injury. Cf. Buckley v. Estate of Pirolo, 101 N.J. 68, 75-76 (1985); Soronen v. Olde Milford Inn, Inc., 46 N.J. 582, 592 (1966).
Against this backdrop, we are entirely satisfied that the trial judge correctly refused to submit the question of plaintiff's negligence to the jury. Simply stated, plaintiff committed the very act that defendants were under a duty to prevent. It is manifest from the record that the effect of the nembutal *496 superimposed on plaintiff's illness substantially beclouded her judgment. Whether or not plaintiff's suicidal gestures were "genuine" or "manipulative" is irrelevant. Plaintiff's self-destructive propensities were plainly part and parcel of the mental illness from which she suffered. A triable factual question was not presented in that regard. We are convinced that on the record before us reasonable minds could not differ in evaluating plaintiff's conduct. Under these circumstances, we perceive no error in the trial judge's refusal to instruct the jury on plaintiff's negligence.

II
Defendants' remaining arguments are clearly without merit and do not warrant extensive discussion. R. 2:11-3(e)(1)(E). We reject the contention advanced by both Dr. Doering and Valley Hospital that Dr. Kuvin's testimony exceeded the scope of his written report. Dr. Kuvin's opinions concerning the malpractice of the hospital, physicians and nurses did not deviate from the views expressed in his report. In any event, imposition of the sanction of preclusion would have been unreasonable under the circumstances. See Skibinski v. Smith, 206 N.J. Super. 349, 355 (App.Div. 1985); Westphal v. Guarino, 163 N.J. Super. 139, 145-146 (App.Div. 1978), aff'd o.b. 78 N.J. 308 (1978).
Equally unpersuasive is Valley Hospital's assertion that the testimony of plaintiff's experts constituted net opinions. Our review of the record convinces us that the conclusions of the experts were amply supported by factual evidence. Buckelew v. Grossbard, 87 N.J. 512, 525 (1981).
Finally, we find no merit in Valley Hospital's argument that the jury's verdict was against the weight of the evidence. The result reached by the jury does not constitute a "manifest denial of justice." Baxter v. Fairmont Food Co., 74 N.J. 588, 598 (1977).
Accordingly, the judgment of the Law Division is affirmed.
NOTES
[1] A "suicide watch" is a procedure whereby the patient is placed under the constant attention of at least one nurse.