10 Cal.Rptr.3d 137 (2004)
116 Cal.App.4th 170
Carlos HERNANDEZ, Individually and as Administrator, etc., et al., Plaintiffs and Appellants,
v.
KWPH ENTERPRISES et al., Defendants and Respondents.
No. F042018.
Court of Appeal, Fifth District.
February 26, 2004.
*138 Law Offices of Federico C. Sayre, Federico C. Sayre, Kent M. Henderson, Rex Hwang and Daniel H. Cargnelutti, Santa Ana, for Plaintiffs and Appellants.
Law Offices of Cornwell & Sample, Stephen R. Cornwell and Rene Turner Sample for Defendants and Respondents.

OPINION
DAWSON, J.
We hold in this case that emergency medical technicians (EMT's) had no legal duty to prevent their voluntary charge from leaving their ambulance, despite their belief or suspicion that she was mentally unbalanced. Thus respondent EMT's and their employer, KWPH Enterprises, doing business as American Ambulance, are not liable for the death of Mrs. Morena Hernandez, which occurred when she was struck by a motor vehicle after leaving the ambulance. We affirm the trial court's grant of summary judgment to respondents. Viewed in the light most favorable to appellants, the evidence is as follows.

*139 FACTS
Morena Hernandez had been acting strangely for four days prior to her death. She believed someone had placed a spell on her, that she was being followed, that she was bewitched. She suspected the food she was given had been poisoned. On November 2, 1997, her husband (appellant Carlos Hernandez) and one of her brothers took Mrs. Hernandez to the emergency room at White Memorial Medical Center in Los Angeles, hoping that the hospital would admit and treat her. The physician who saw Mrs. Hernandez did not admit her but did prescribe a medication, Ativan.
Mr. Hernandez and his wife's brothers believed it would be best for the couple to retire temporarily to the tranquil environment of the home of a brother in Mendota, California. Leaving their child (appellant Michael Hernandez) with other relatives in Los Angeles, Mr. and Mrs. Hernandez traveled to Mendota. They arrived at approximately midnight and soon attempted sleep. Mrs. Hernandez, however, was not deterred from her strange behavior. She roused her husband, complaining that "[t]hey're coming. They're going to find us here," and "I feel ill. I want to go to a hospital.... Let's go see a doctor."
Mr. and Mrs. Hernandez left the brother's home on foot. At approximately 2:00 a.m., sheriff's deputy Thomas Lawson, who had been summoned by the family, found Mr. and Mrs. Hernandez walking down a street two or three blocks from the brother's home.
Deputy Lawson spoke to Mrs. Hernandez, whom he found articulate and calm. Despite that, he did evaluate Mrs. Hernandez's mental status pursuant to Welfare and Institutions Code section 5150 (section 5150) to determine whether she was able to care for herself and whether she presented a danger to herself or to others. He decided not to detain her.[1]
Mrs. Hernandez told Deputy Lawson that she and her husband would like to go to a "nice hospital" to speak with a psychiatrist and, though he did not detain, Deputy Lawson did summon an ambulance. It took 10 to 20 minutes for the ambulance to arrive, during which time Mrs. Hernandez spoke to Deputy Lawson about her religion. Mr. Hernandez was quiet during much of this conversation as he spoke little English and Lawson, little Spanish.
When the ambulance arrived, manned by respondents Michael Kallsen and Brent Jensen, there was further discussion about Mrs. Hernandez's mental status. When Deputy Lawson explained to Kallsen and Jensen that he was not detaining Mrs. Hernandez, they pointed out that the transport to a hospital under those circumstances would be voluntary and could be terminated at the option of Mr. and Mrs. Hernandez. They asked Mr. and Mrs. Hernandez whether they wanted to go, to which they received positive response.
Kallsen and Jensen believed they were transporting both Mr. and Mrs. Hernandez to the hospital. While en route, Jensen filled out pay bills for both. He also noted on his records that Mrs. Hernandez reported "poss[ible] ingestion/poisoning by family" and that "EMS [the ambulance team] feels pt [patient] 5150, but FSO [sheriff's deputy] does not." Respondents took Mr. and Mrs. Hernandez to Madera Community Hospital rather than to a closer facility in Dos Palos because both psychiatric *140 staff and blood tests for poisoning would be available there.
Kallsen and Jensen did not notice either Mrs. or Mr. Hernandez to be agitated during the ride to Madera, which took approximately 25 minutes. Apparently, however, Mrs. Hernandez had developed the feeling that Kallsen and Jensen were going to confine or harm her in some way. Before they began the trip to Madera, she told her husband "[d]on't turn to look at them.... They're going to mess us both up." Mr. Hernandez did not inform Kallsen or Jensen of his wife's fear, though he did tell them she was "not well."
When they reached the hospital and Jensen opened the door of the ambulance, Mrs. Hernandez surprised even her husband by dashing away. When Mr. Hernandez attempted to follow, Kallsen and Jensen momentarily delayed his pursuit by putting their hands out to stop him. He remained behind his wife by one-half to one block's distance as the two proceeded on foot away from the hospital doors, across the grounds, onto a local roadway, and then onto Highway 99.
Neither Kallsen nor Jensen attempted to stop Mrs. Hernandez. Instead, they went inside the hospital to inform personnel what had occurred. Then they returned to the ambulance, tidied the interior, contacted their dispatch, and commenced a return to their station in Mendota. Leaving the hospital grounds, they saw both Mrs. and Mr. Hernandez walking from there onto a local road. Apparently concerned, they contacted the Madera Police Department. Moments later, when they saw Mr. and Mrs. Hernandez approach Highway 99, they contacted the California Highway Patrol.
Before officers arrived, Mrs. Hernandez made her way across one side of Highway 99, over the median barrier, and out into the roadway on the other side. She attempted to flag down one vehicle, without success, and was then hit and killed by another. Kallsen and Jensen grabbed Mr. Hernandez and put him into their ambulance until help arrived.

ANALYSIS

I. Standard of Review
A motion for summary judgment is an assertion by the moving party that no triable issues of fact exist and that the court should terminate the action without trial. (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment must show that the plaintiff's claims are without merit  that is, that there are no triable issues of material fact and that the defendant is entitled to judgment as a matter of law. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 843, 107 Cal.Rptr.2d 841, 24 P.3d 493.) In ruling on the motion, the court must resolve all doubts regarding the existence of triable issues of material fact in favor of the party opposing the motion, must consider all of the evidence, including inferences reasonably drawn from it, and must view the evidence in the light most favorable to the opposing party. (Ibid.)
On appeal, the court "determines de novo `whether an issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law.'" (Pensinger v. Bowsmith, Inc. (1998) 60 Cal.App.4th 709, 717, 70 Cal.Rptr.2d 531, disapproved on other grounds in Colmenares v. Braemar Country Club, Inc. (2003) 29 Cal.4th 1019, 1031, fn. 6, 130 Cal.Rptr.2d 662, 63 P.3d 220, quoting Brantley v. Pisaro (1996) 42 Cal.App.4th 1591, 1601, 50 Cal.Rptr.2d 431.) The appellate court "must assume the role of the trial court and redetermine the merits of the motion" using the same standards required below. (Martinez v. County of Los *141 Angeles (1996) 47 Cal.App.4th 334, 341, 54 Cal.Rptr.2d 772.) Our review, therefore, is limited, as was "the trial court's, to determining if `there is evidence requiring the fact-weighing procedures of a trial.'" (Pensinger v. Bowsmith, Inc., supra, at p. 717, 70 Cal.Rptr.2d 531, quoting Frank and Freedus v. Allstate Ins. Co. (1996) 45 Cal.App.4th 461, 468, 52 Cal.Rptr.2d 678.)

II. The Trial Court Did Not Err in Granting Summary Judgment
Each of appellants' causes of action against respondents was based on Kallsen and Jensen's alleged negligence in failing to observe and supervise Mrs. Hernandez, failing to restrain her and prevent her from straying from their care, and failing to apprehend her once she had done so.[2] To prove their case, appellants were required to show that respondents owed Mrs. Hernandez a duty of care, which they breached by conduct falling below a defined standard of care, plus causation and damages. (Wright v. City of Los Angeles (1990) 219 Cal.App.3d 318, 344-345, 268 Cal.Rptr. 309.) Respondents assert and appellants agree that the negligence required to be shown was gross negligence, as Health and Safety Code section 1799.106 insulates EMT's from liability for ordinary negligence in the performance of their duties.[3] (See Wright, at pp. 345-347, 268 Cal.Rptr. 309. See also Health & Saf.Code, § 1799.108.)
The question whether an applicable standard of care has been breached ordinarily is one of fact. (Compare Lugtu v. California Highway Patrol (2001) 26 Cal.4th 703, 724, fn. 13, 110 Cal.Rptr.2d 528, 28 P.3d 249 with Eastburn v. Regional Fire Protection Authority (2003) 31 Cal.4th 1175, 1185, 7 Cal.Rptr.3d 552, 80 P.3d 656.) Where medical personnel are accused of negligence, generally there must be expert testimony regarding the standard of care. (Flowers v. Torrance Memorial Hospital Medical Center (1994) 8 Cal.4th 992, 1001, 35 Cal.Rptr.2d 685, 884 P.2d 142.) Here, both appellants and respondents submitted affidavits from experts  in both cases from emergency room physicians with significant experience in the subjects of emergency medical response and management of response teams.
Dr. Tucker James Bierbaum, for respondents, pointed out that neither Kallsen nor Jensen was authorized to initiate a hold on Mrs. Hernandez pursuant to section 5150, and that they had been informed by the attending law enforcement officer, who was so authorized, that no hold was being placed. Based on that, the doctor opined, Kallsen and Jensen had acted appropriately in transporting Mrs. Hernandez to Madera Community Hospital on a voluntary basis, had complied with the professional standard of care, and had been under no *142 "duty or obligation to chase or try to catch Ms. Hernandez. They followed appropriate protocol by advising the base hospital of her decision to leave the scene ... and by trying to convince Mr. Hernandez to remain at the scene."
Dr. Paul Kenneth Bronston, for appellants, disagreed. He reviewed various of respondents' policies and procedures and concluded that Kallsen and Jensen breached the applicable standard of care in that they could have determined Mrs. Hernandez was incapable of giving informed consent because of her altered mental state, and thus could have prevented her from leaving their care before delivering her into the hospital. They were, in Dr. Bronston's opinion, and because they believed Mrs. Hernandez to be in an altered mental state, under an "affirmative duty to deliver [Mrs. Hernandez] to appropriate medical staff at the hospital using whatever means were appropriate under the Policies and Procedures." Their failure to do so, in Dr. Bronston's opinion, was an "extreme deviation" from the required standard of care.
These dueling expert opinions created a factual dispute not appropriately resolved by way of summary judgment. (Kockelman v. Segal (1998) 61 Cal.App.4th 491, 505, 71 Cal.Rptr.2d 552.) The opinions, however, address only the question whether a standard of care was breached. They do not define the extent of any legal duty owed to Mrs. Hernandez by respondents.
"... The existence of a duty of care is a question of law to be determined by the court alone. [Citations.] This is because `legal duties are ... merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' (Tarasoff v. Regents of University of California (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334]....) Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. [Citation.]
"Examining whether a legal duty exists and whether a particular defendant was negligent is not a coterminous exercise. Fulfilling the court's responsibility to determine if a legal duty exists necessarily requires consideration and balancing of sometimes competing public policies which may be irrelevant to the factual determination of whether the challenged conduct fell below the prevailing standard of care." (Adams v. City of Fremont (1998) 68 Cal.App.4th 243, 265, 80 Cal.Rptr.2d 196.)
Further, it is not the case that because Kallsen and Jensen could have restrained Mrs. Hernandez pursuant to respondents' policies and procedures  accepting that to be true for purposes of analysis  they necessarily had a legal duty to do so. (Knighten v. Sam's Parking Valet (1988) 206 Cal.App.3d 69, 76, 253 Cal.Rptr. 365 ["The right to act, however, is far different from a duty to act"]; see also Stout v. City of Porterville (1983) 148 Cal.App.3d 937, 945-947, 196 Cal.Rptr. 301.) We proceed, therefore, to a consideration of the factors which will determine whether and to what extent respondents owed a duty of care to Mrs. Hernandez.
It is appropriate first to attempt to define the duty which appellants ask this court to confirm. That can be done in part by a process of elimination. We address in this case neither the general duty of EMT's to perform their functions with due care, nor a situation in which the alleged negligence arises from a failure to perform some required aspect of an emergency medical procedure. (See, e.g., Wright v. City of Los Angeles, supra, 219 Cal.App.3d at p. 345, 268 Cal.Rptr. 309; see also Lugtu v. California Highway Patrol, supra, 26 *143 Cal.4th at pp. 716-717, 110 Cal.Rptr.2d 528, 28 P.3d 249 [misfeasance versus nonfeasance].) Appellants acknowledge that this case does not involve misfeasance but, instead, a failure to take positive steps to protect Mrs. Hernandez from herself. Such a proposed duty has been labeled variously, in other similar situations, as a "duty to prevent harm" (Adams v. City of Fremont, supra, 68 Cal.App.4th at p. 263, 80 Cal.Rptr.2d 196), a "duty to come to the aid of another" (Stout v. City of Porterville, supra, 148 Cal.App.3d at p. 942, 196 Cal.Rptr. 301), and a "duty to take precautions" against a person's harming himself or herself in some foreseeable way (Nally v. Grace Community Church (1988) 47 Cal.3d 278, 294, 253 Cal.Rptr. 97, 763 P.2d 948).[4]
Appellants contend there was a "special relationship" between respondents and Mrs. Hernandez, which gave rise to a duty owed by them to protect her from the harm she suffered. (See Adams v. City of Fremont, supra, 68 Cal.App.4th at pp. 285-287, 80 Cal.Rptr.2d 196 (maj. opn. of Ruvolo, J.) and id. at pp. 307-308, 80 Cal.Rptr.2d 196, (dis. opn. of Kline, P.J.) [contrasting views of the contraction or expansion of the law on duty and special relationships].) In support, appellants cite the opinions in three cases  Vistica v. Presbyterian Hospital (1967) 67 Cal.2d 465, 62 Cal.Rptr. 577, 432 P.2d 193, Meier v. Ross General Hospital (1968) 69 Cal.2d 420, 71 Cal.Rptr. 903, 445 P.2d 519, and Kockelman v. Segal, supra, 61 Cal.App.4th 491, 71 Cal.Rptr.2d 552  in all of which the courts recognized a duty to take measures to prevent a person's suicide.
In both Vistica and Meier, the issue presented was error alleged in connection with instructions on the doctrine of res ipsa loquitur. (Vistica v. Presbyterian Hospital, supra, 67 Cal.2d at pp. 468-471, 62 Cal.Rptr. 577, 432 P.2d 193; Meier v. Ross General Hospital, supra, 69 Cal.2d at pp. 423-432, 71 Cal.Rptr. 903, 445 P.2d 519.) The existence of a duty was assumed, and the special relationship doctrine was not discussed. Review of those opinions suggests a reason why duty was not in question: they involved allegations of medical/psychiatric malpractice in connection with the treatment of suicidal patients. In that sense, the cases involved alleged misfeasance by the defendants. (See also Gonzalez v. Paradise Valley Hosp. (2003) 111 Cal.App.4th 735, 3 Cal.Rptr.3d 903.) As noted in Nally v. Grace Community Church, supra, 47 Cal.3d 278, 253 Cal.Rptr. 97, 763 P.2d 948, the opinions in Vistica and Meier simply "recognized that a cause of action may exist for professional malpractice when a psychiatrist's (or hospital's) treatment of a suicidal patient falls below the standard of care for the profession, thus giving rise to a traditional malpractice action." (Nally, at pp. 295-296, 253 Cal.Rptr. 97, 763 P.2d 948, italics in original.)
Though the existence of a special relationship is discussed in Kockelman v. Segal, supra, 61 Cal.App.4th 491, 71 Cal.Rptr.2d 552, that opinion also ends by finding "only that a psychiatrist's duty of care to a patient, which may include taking appropriate suicide prevention measures if warranted by all of the circumstances, is not negated by the patient's status as an outpatient." (Id. at p. 503, 71 Cal.Rptr.2d 552.)
*144 Certainly, neither Vistica, Meier, nor Kockelman supports the broad proposition suggested by appellants  that "when those who accept the responsibility of caring for others learn that their charges may pose a danger to themselves, they owe a duty of reasonable care to prevent such harm." In fact, the Supreme Court has expressly rejected this proposition in its opinion in Nally v. Grace Community Church in which the court refused to find a special relationship between clergymen-counselors and the decedent, though the defendants had been aware of the decedent's suicidal thoughts. (Nally v. Grace Community Church, supra, 47 Cal.3d at p. 296, 253 Cal.Rptr. 97, 763 P.2d 948.)
Appellants also rely on Johnson v. County of Los Angeles (1983) 143 Cal.App.3d 298, 191 Cal.Rptr. 704 for the proposition that a duty to protect existed here, arising from a special relationship. The Johnson court found that officers who arrested the decedent had a special relationship both with him and with his survivors. (Id. at p. 311, 191 Cal.Rptr. 704.) The defendant officers had learned at the time of arresting the decedent that he was mentally ill, and suicidal without his medication. They promised his wife they would obtain medical attention for him and would notify her before his release from custody so that she could then see to his needs. They even, in fact, specifically requested that she refrain from interfering in the meantime  a request with which she complied. They then failed to follow through with their promises, released the decedent without treatment or medication, and did not notify his wife of his release. (Id. at pp. 304-305, 191 Cal.Rptr. 704.) He committed suicide two days later. (Id. at p. 304, 191 Cal.Rptr. 704.) The special relationship, creating a duty to warn, stemmed in part from the officers' promises and the plaintiffs' reliance  a common theme in cases in which special relationships have been found. (See Adams v. City of Fremont, supra, 68 Cal.App.4th at pp. 280-281, 80 Cal.Rptr.2d 196; Stout v. City of Porterville, supra, 148 Cal.App.3d at pp. 942-943, 196 Cal.Rptr. 301.) No such promises or reliance have been shown here.
Mann v. State of California (1977) 70 Cal.App.3d 773, 139 Cal.Rptr. 82, also cited by appellants, involved proof of reliance by the injured parties and conduct by the defendant, a California Highway Patrol officer, inducing such reliance. The potentially broad sweep of the opinion in Mann has been limited repeatedly by subsequent opinions interpreting it. (See, e.g., Williams v. State of California (1983) 34 Cal.3d 18, 25-26, 192 Cal.Rptr. 233, 664 P.2d 137; Davidson v. City of Westminster (1982) 32 Cal.3d 197, 207-208, 185 Cal.Rptr. 252, 649 P.2d 894; Benavidez v. San Jose Police Dept. (1999) 71 Cal.App.4th 853, 867, 84 Cal.Rptr.2d 157; Stout v. City of Porterville, supra, 148 Cal.App.3d at p. 943, 196 Cal.Rptr. 301.) The last word from our Supreme Court on the proper interpretation of Mann is found in Zelig v. County of Los Angeles (2002) 27 Cal.4th 1112, 1129, 119 Cal.Rptr.2d 709, 45 P.3d 1171, where the court discussed Mann as a case in which "an officer undert[ook] affirmative acts that increase[d] the risk of harm to the plaintiff." This is not such a case.
Appellants contend a special relationship arises here from "[t]he affirmative act of accepting Mrs. Hernandez into the ambulance, the knowledge that Mrs. Hernandez was in need of medical attention and the belief that she was likely a danger to herself or others...." We question whether Kallsen and Jensen's impression that Mrs. Hernandez was "5150" equates with a belief that she was "likely a danger to herself or others." There is no evidence presented as to what "5150" meant to either Kallsen *145 or Jensen, save Kallsen's deposition testimony that, under applicable guidelines, a person is 5150 when "endangering others, endangering themselves, or gravely disabled." Under that definition, Kallsen and Jensen could have believed Mrs. Hernandez was "5150" without thinking she posed a danger to herself or others.[5]
Appellants have failed to show a special relationship. None of the authorities cited by appellants support the proposition that, because they undertook to transport Mrs. Hernandez to a hospital, at her request, respondents can be held to have undertaken also to protect her from her own suicidal, reckless or irrational subsequent conduct. Indeed, the law is to the contrary. (Cf. Nally v. Grace Community Church, supra, 47 Cal.3d at p. 296, fn. 6, 253 Cal.Rptr. 97, 763 P.2d 948 [court has "never imposed `an affirmative duty on a psychiatrist to see that his patient does no harm to himself'"].) Thus, appellants cannot show that respondents owed Mrs. Hernandez a duty to protect as alleged.

III. Conclusion
"[T]o say that a `special relationship' exists [or does not exist] is to say nothing other than the factors favoring imposition of a duty of care in particular circumstances outweigh [or do not outweigh] the countervailing factors...." (Hansra v. Superior Court (1992) 7 Cal.App.4th 630, 646, 9 Cal.Rptr.2d 216.) We believe that using another approach to duty analysis in this case  that is, the approach of analyzing various factors discussed in and often quoted from the opinion in Rowland v. Christian (1968) 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561  would lead to the same result we reach through examining the evidence for a special relationship.
Though we refrain from discussing at length the Rowland v. Christian factors, we do note, as did the trial court, that the causal connection between Kallsen and Jensen's conduct and the death of Mrs. Hernandez was attenuated and remote. This weighs against a finding of duty. (Nally v. Grace Community Church, supra, 47 Cal.3d at pp. 296-297, 253 Cal.Rptr. 97, 763 P.2d 948.)
At least as important, however, are the potential consequences to the community should the court recognize the duty appellants suggest. In that regard, we note that both the courts and the Legislature have been loath to discourage the provision of necessary emergency services through the recognition of liability incurred in connection with them. (See, e.g., Eastburn v. Regional Fire Protection Authority, supra, 31 Cal.4th at pp. 1183-1185, 7 Cal.Rptr.3d 552, 80 P.3d 656, and authorities cited therein.) Recognition of the duty appellants suggest could subject emergency service providers to a Hobson's choice of liability for violating that duty or liability for wrongful detention. (See Gonzalez v. Paradise Valley, Hosp., supra, 111 Cal.App.4th at p. 741, 3 Cal.Rptr.3d 903 ["`an involuntary detention ... without consent would arguably constitute kidnapping, false imprisonment, or battery'"].) EMT's would not be immune from liability for wrongful detention, as are those authorized to detain pursuant to section 5150. (See Welf. & Inst.Code, § 5278; see also Gov.Code, § 856.2 [public entities and employees immune from liability for injury to or death of escaping or escaped person who has been confined for mental illness].) *146 Recognition of the suggested duty could create uncertainty and thereby deter the provision of emergency medical services to the mentally ill. Conversely, it could encourage the detention of individuals by persons not qualified or authorized by statute, and thereby contravene the policy of this state to discourage unnecessary interference with the freedom and rights of the mentally ill. (See Bragg v. Valdez (2003) 111 Cal.App.4th 421, 429-430, 3 Cal.Rptr.3d 804.) Thus, matters of public policy, too, dictate that we reject the legal duty to protect which appellants ask that we confirm.

DISPOSITION
The judgment is affirmed. Costs are awarded to respondents.
WE CONCUR: DIBIASO, Acting P.J., and GOMES, J.
NOTES
[1] Section 5150 allows certain persons, including peace officers, to detain or order detained for up to 72 hours "any person [who], as a result of mental disorder, is a danger to others, or to himself or herself, or gravely disabled...." It is agreed that, while Deputy Lawson had the power to detain pursuant to section 5150, respondents did not.
[2] Appellants also alleged in their complaint that Kallsen and Jensen were negligent in preventing Mr. Hernandez from apprehending his wife before she was killed. They have not, however, briefed this as an issue analytically distinct from the allegations of failure to take action to prevent injury to Mrs. Hernandez. Viewed in the light most favorable to appellants, the evidence shows only that Kallsen and Jensen momentarily slowed Mr. Hernandez in his pursuit of his wife by holding up their hands when he, too, appeared to be leaving the ambulance.
[3] Health and Safety Code section 1799.106 reads in relevant part: "[I]n order to encourage the provision of emergency medical services by [EMT's, an EMT] who renders emergency medical services at the scene of an emergency shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions not performed in good faith." No absence of good faith has been alleged by appellants.
[4] Appellants asserted for the first time at oral argument that the evidence shows respondents caused Mrs. Hernandez to enter Highway 99 by following her, in their ambulance, and causing her to attempt to escape them. Arguments not properly raised and developed below will not be considered for the first time on appeal. (Martinez v. Scott Specialty Gases, Inc. (2000) 83 Cal.App.4th 1236, 1249, 100 Cal.Rptr.2d 403.)
[5] Welfare and Institutions Code section 5008, subdivision (h) defines the term "gravely disabled," in pertinent part, to mean "[a] condition in which a person, as a result of a mental disorder, is unable to provide for his or her basic personal needs for food, clothing or shelter."