Filed 9/29/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| T.L., a MINOR,<br><br>       Plaintiff and Appellant,<br><br>v.<br><br>CITY AMBULANCE OF EUREKA, INC., et al.,<br><br>       Defendants and Respondents. | A162508<br><br>(Humboldt County Super. Ct. No. DR180790) |

**INTRODUCTION**

While plaintiff was being transported by ambulance from a crisis stabilization unit to an inpatient psychiatric facility, she suddenly unbuckled the two belts strapping her to the semi-reclined gurney and stepped out of the back of the moving ambulance, sustaining serious injuries. She sued the ambulance company and the paramedic and EMT staffing the ambulance.

At the stabilization unit, plaintiff had been placed on a "section 5585" 72-hour mental health hold. (Welf. & Inst. Code, § 5585.[1]) However, she was calm and cooperative while at the unit, was never diagnosed as being a danger to herself, and was transported by ambulance to and from a local hospital for a medical clearance, without incident. Her attending psychiatrist

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

determined she was also stable for transport to the in-patient facility, where she could receive a higher level of care than was available locally.

Defendants moved for summary judgment on the sole ground they owed no duty "to prevent plaintiff from engaging in impulsive, reckless, irrational and self-harming conduct," relying on *Hernandez v. KWPH Enterprises* (2004) 116 Cal.App.4th 170 (*Hernandez*). Concluding *Hernandez* was dispositive, the trial court granted the motion.

Plaintiff appeals, claiming *Hernandez* is distinguishable and defendants owed her a general duty to act with due care. We agree with plaintiff and reverse.

## BACKGROUND

In the fall of 2017, plaintiff's guardians brought her to the county Same-Day Services Department, where she was evaluated by a "Crisis Stabilization Unit" clinician. She was subsequently admitted, on a voluntary basis, to the stabilization unit.

Later that afternoon, the crisis clinician completed [REDACTED TEXT] (some capitalization omitted) placing plaintiff on a mental health hold under section 5585.[2]

[REDACTED TEXT.]

In the stabilization unit, plaintiff was evaluated by the attending physician, Dr. Qyana Griffith, a board-certified psychiatrist and neurologist. Dr. Griffith noted plaintiff had a history of cannabis disorder, meaning she

---

[2] [REDACTED TEXT.] The purpose of a mental health hold under section 5585, specifically, is to provide "prompt evaluation and treatment of minors with mental health disorders, with particular priority given to seriously emotionally disturbed children and adolescents." (§§ 5585.10, subd. (a), 5585.20.)

was devoting "a lot of time trying to obtain" the substance, to the extent it interfered with day-to-day activities.  Plaintiff stated she was not attending school because she was being bullied, [REDACTED TEXT].  Plaintiff did not report any suicide "ideations" (meaning "thoughts of hurting herself") or other "self-injurious behavior."

Based on what the clinician reported [REDACTED TEXT].

Dr. Griffith also concluded [REDACTED TEXT].  Dr. Griffith explained that her conclusion in this regard was based, in part, on the fact plaintiff [REDACTED TEXT].  Plaintiff was "fidgety" during the assessment but did not "display any aggressive" or "self-injurious behaviors."

Later that day, after Dr. Griffith and the medical staff determined she was safe for transport, plaintiff was taken by ambulance to and from a local hospital for a "medical clearance" as to her physical health.  Dr. Griffith would not have approved the transport had plaintiff been "in an agitated state" or "uncooperative."  The transport to and from the hospital was uneventful.  The lab work indicated she was "basically a healthy young lady medically."

The following day, when plaintiff was discharged and prepared for transport to the inpatient [REDACTED TEXT].  Dr. Griffith distinguished, however, between [REDACTED TEXT].

Prior to transport, Dr. Griffith [REDACTED TEXT].  Dr. Griffith based her opinion plaintiff was "stable for transfer" and "could be safely transferred," in part, on the fact "the staff members and nurses that were with [plaintiff] near the time of the transfer did not report any issues" to Dr. Griffith.  Had the nursing staff monitoring plaintiff had any concern she was not ready for transport, they would have alerted Dr. Griffith.  Dr. Griffith also independently considered "everything" she and the staff had learned and

3

observed during plaintiff's two-day stay in the stabilization unit, including "the one-on-one reports[3] to the nurse and then the nurse reports to me and we get collateral from outside, so we take everything into consideration."

[REDACTED TEXT.]

Dr. Griffith acknowledged that one of her responsibilities as the attending psychiatrist is patient safety during a transport, and she determined plaintiff "could be safely transferred without a doctor's order prescribing a specific position" during the transfer, "including an order pertaining to restraints." Dr. Griffith stated an attending physician would order restraints if, based on his or her personal experience with and observation of the patient, he or she concluded restraints were necessary. She also agreed it would be appropriate for a physician to write such an order "if the patient is exhibiting symptoms or behavior that rises to the level of presenting an imminent risk of self-harm or harm to others." She could not identify any other circumstance where the use of restraints would be appropriate.

Dr. Griffith had never written such an order. Rather, it was her practice not to approve transport unless, in her judgment, the patient was stable and could be safely transported, and if she had any doubt that was the case, she would postpone transfer. As to patients being transported to an inpatient psychiatric facility, Dr. Griffith takes every step to "get them to the point of where they are calm and can be transported" safely, which may include the use of medication. "[W]e try to make sure that they're not in [a] situation where they need restraints." If the patient was combative, she

_____

3 Plaintiff received "one on one" care and attention while she was in the stabilization unit.

4

would not authorize transport. She did not give "specific consideration" to the use of soft restraints (light Velcro cuffs) during plaintiff's transfer, and stated the use of even soft restraints on a patient who is calm and cooperative could aggravate the patient.

Dr. Griffith acknowledged she had completed "[h]undreds" of transfer forms and could not recall ever having checked a box in the "position during transfer" section. It was her practice to leave it to the nursing and ambulance staff to determine the "particular mode of transfer." It was her understanding the discharge nurses "would always provide input into the position during transfer" and that the EMTs would determine the position.

Dr. Griffith also acknowledged a psychiatric patient could "potentially" hurt themselves or others, [REDACTED TEXT].

It is not clear from the record before us exactly what Gilbert Fan (the paramedic) and George Schild (the EMT) knew when they placed plaintiff into the ambulance for transport.

In his deposition testimony (only excerpts of which are in the record), Fan stated that while he was receiving a "run-down" from the nurse, he was "looking over the documents."[4] It seems apparent Fan read the [REDACTED TEXT] form and was aware of, and at least glanced at, some of the other medical records. The nurse told him plaintiff "was on a 5150 hold" and "the patient has been calm [and] cooperative with them, no issues," "she was okay for transfer," and was [REDACTED TEXT]. Fan asked the nurse if there was "anything [he] should be worried or concerned about." She repeated plaintiff was "calm, cooperative, and stable for transport." Fan, himself, found

---

[4] [REDACTED TEXT.]

plaintiff "calm and cooperative" and "willingly" "following commands." [REDACTED TEXT.]

Schild's testimony was similar (again, only excerpts of his deposition testimony are in the record). Plaintiff was "cool, calm and cooperative." He asked a "few basic questions" to which she did not respond, and she was facially expressionless. She was not "fidgety" and followed all his requests. Schild did not recall talking to the nurse, who spoke with Fan. He glanced at some of the documents in the package of medical records, but did not read everything on every page. He "look[ed] at the 5150 paperwork." He would routinely read "any relevant nurses' notes," and assumes he did so. But nothing in the record indicates which of these notes he would have read. There "was no indication," "[b]ased on everything [they] gave" him and Fan, as well their own personal observation of plaintiff, that "there was something wrong," that she was having [REDACTED TEXT]. He did not observe any behavior suggesting plaintiff "was potentially violent," and no one at the unit told him she "was potentially violent."

The ambulance company has a specific policy pertaining to the use of restraints. It states, in pertinent part:

> "B. Restraints are to be used only when necessary, in situations where the patient is potentially violent and is exhibiting behavior that is potentially dangerous to self and/or others, **and**:
>     1. the patient is under arrest and the law enforcement officer permits restraints, **or**
>     2. the patient is under a 5150 hold and 5150 documentation is transported with the patient, **or**
>     3. Unable rather than unwilling to follow directions.-i.e. confused, delirious, disoriented, or extremely restless. They may be grabbing, pulling or tugging tubes, line or other therapeutic devices."

Schild understood this policy meant ambulance personnel were authorized to use restraints under certain circumstances. But even if such circumstances existed, they were not required to do so. It was also his understanding there had to be "consensus" between the ambulance personnel before restraints were used. Schild explained that when "we restrain someone, we have, you know, one arm up, high up. One arm down low. And then the legs are also restrained." On a long transfer, that could "harm the patient, having their arms like that, not being able to move at all." Schild did not think this was "humane" or "fair" to a patient who is "cool, calm, collected." Schild was "not going to just restrain a patient just because they have a 5150 hold." And if "the patient was . . . cooperative and noncombative" he "[a]bsolutely [would] not" use restraints. When asked about the use of shoulder straps in addition to lap belts, Schild agreed they "could help restrain a patient," but did not think any of the gurneys used by the company had them.

At Schild's request, plaintiff got onto the gurney, which was in a partially upright position so she would be more comfortable during the trip, expected to be at least four hours. Fan and Schild buckled her in with two safety belts. Schild rode in the back of the ambulance with plaintiff and worked on the paperwork for her transport on his laptop.

Fifteen minutes into the transport—without warning and in a matter of seconds—plaintiff unbuckled both belts at the same time, moved to the back of the ambulance, opened the door, and stepped out. There had been "absolutely zero indication" that she would do "something erratic." She ignored Schild's directives to stop. Fan had already begun pulling the ambulance to a stop, and they immediately provided plaintiff life-saving care and transported her to the local hospital.

7

Plaintiff subsequently filed suit, alleging four causes of action: medical and professional negligence, ordinary negligence, negligent retention, hiring, and training, and common carrier liability. Defendants eventually moved for summary judgment on the ground they owed no duty of care "to prevent [plaintiff] from engaging in impulsive, reckless, irrational and self-harming conduct," relying on *Hernandez, supra,* 116 Cal.App.4th 170.

Plaintiff maintained *Hernandez* was distinguishable and defendants owed her a general duty of due care. In support of her opposition, plaintiff submitted the declaration of Scott Jones, a proffered expert on the ostensible standard of care applicable to ambulance personnel transporting someone experiencing mental health issues similar to plaintiff's. Jones variously opined "[p]atients placed on a 5150/5585 hold are dangerous," the fact plaintiff "was under a 72-hold should have been received as a warning this person might act out," "[w]here patients placed on a 72-hour 5150 hold (5585 for minors) are evaluated by mental health experts and professionals and determined to be at a risk of harm either to themselves or others, the attention of a certified EMT and/or licensed Paramedic is to further protect the individual placed in their care." He further opined that while "[t]he current mental state of a patient under such hold is to be considered," it is "not absolute evidence of the patient's 'mental state' " and "[p]atient history and past capabilities must also be considered." Jones maintained defendants had not acted in accordance with the applicable standard of care and there were options to ensuring plaintiff's safety, including using "soft restraints" on the siderails of the gurney (rather than securing one arm up and one arm down), locking the rear doors of the ambulance, and using shoulder

harnesses—all of which would have impeded plaintiff and given the EMT more time to react.[5]

The trial court granted defendants' motion, concluding that under *Hernandez,* they had no "duty to prevent Plaintiff from engaging in impulsive, reckless, irrational and self-harming conduct over and beyond the actions Defendant did take."

## DISCUSSION[6]

### *Duty of Due Care: Section 1714 and the* Rowland *Factors[7]*

Our Supreme Court has, in a number of its more recent opinions, instructed the courts as to the legal lens we must employ in considering the threshold issue of duty.  As the high court explained in in *Kesner v. Superior*

---

[5] In reciting from Jones's declaration, we are not expressing any view as to whether he is actually qualified to render an opinion on the subject, or whether any opinion he may offer meets the criteria set forth in *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747. Those are matters for the trial court to determine in the first instance.

[6] Our standard of review is well-established.  "A motion for summary judgment is properly granted 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  (Code Civ. Proc., § 437c, subd. (c).)" (*Horne v. District Council 16 Internat. Union of Painters & Allied Trades* (2015) 234 Cal.App.4th 524, 534.)  On appeal, "we independently examine the record to determine whether there are any triable issues of material fact. [Citation.]  In performing our review, we view the evidence in the light most favorable to plaintiffs as the losing parties, resolving any evidentiary doubts or ambiguities in their favor."  (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1102.)

[7] *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*), "was partially superseded by statute on a different issue as stated in *Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 722, . . . disapproved on a different issue in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853."  (*Smith v. Freund* (2011) 192 Cal.App.4th 466, 473, fn. 5.)

9

*Court* (2016) 1 Cal.5th 1132 (*Kesner*)*,* " 'California law establishes the general duty of each person to exercise, in his or her activities, reasonable care for the safety of others. (Civ. Code, § 1714, subd. (a).)' [Citation.] . . . The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." (*Id.* at pp. 1142-1143.) Accordingly, " 'in the absence of a statutory provision establishing an exception to the general rule of Civil Code section 1714, courts should create one only where "clearly supported by public policy." ' " (*Kesner,* at p. 1143, quoting *Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771 (*Cabral*).)

"In determining whether policy considerations weigh in favor of such an exception . . . the most important factors are 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' " (*Kesner, supra,* 1 Cal.5th at p. 1143, quoting *Rowland, supra,* 69 Cal.2d at p. 113.)

"Because a judicial decision on the issue of duty entails line drawing based on policy considerations, 'the *Rowland* factors are evaluated at a relatively broad level of factual generality.' " (*Kesner, supra,* 1 Cal.5th at p. 1143, quoting *Cabral, supra,* 51 Cal.4th at p. 772.) Thus, in applying the *Rowland* factors, the courts do not ask whether they " 'support an exception to the general duty of reasonable care on the facts of the particular case

10

before' " the court, " 'but whether carving out an entire category of cases from that general duty rule is justified by clear considerations of policy.' " (*Kesner, supra,* 1 Cal.5th at pp. 1143-1144, quoting *Cabral, supra,* 51 Cal.4th at p. 722.)

" 'By making exceptions to Civil Code section 1714's general duty of ordinary care only when foreseeability and policy considerations justify a categorical no-duty rule, [the courts] preserve the crucial distinction between a determination that the defendant owed the plaintiff no duty of ordinary care, which is for the *court* to make, and a determination that the defendant did not breach the duty of ordinary care, which in a jury trial is for the *jury* to make.' " (*Kesner, supra,* 1 Cal.5th at p. 1144, quoting *Cabral, supra,* 51 Cal.4th at p. 772.) "In this respect, duty differs from the other elements of a tort. Breach, injury, and causation must be demonstrated on the basis of facts adduced at trial, and a jury's determination of each must take into account the particular context in which any act or injury occurred. Analysis of duty occurs at a higher level of generality."[8] (*Kesner,* at p. 1144.)

### Defendants Owed a General Due of Due Care

Defendants maintain, and the trial court concluded, *Hernandez, supra,* 116 Cal.App.4th 170, is dispositive, and under its reasoning, defendants owed

---

[8] Thus, in *Kesner,* the court's "task [was] not to decide whether [plaintiffs] have proven that asbestos from [defendants] actually and foreseeably reached [plaintiffs], or whether [defendants'] asbestos contributed to the disease that [they] suffered, or whether [defendants] had adequate procedures in place to prevent take-home exposure." Rather, it was "to determine whether household exposure is *categorically* unforeseeable and, if not, whether allowing the possibility of liability would result in such significant social burdens that the law should not recognize such claims." (*Kesner, supra,* 1 Cal.5th at p. 1144.)

11

no duty to protect plaintiff from her sudden act of self-harm.[9]  Plaintiff maintains *Hernandez* is distinguishable.

In *Hernandez*, an ambulance picked up the plaintiff and his wife, apparently from a sidewalk locale, after having been summoned by a deputy sheriff responding to a call to the Sheriff's Department by worried family members.  (*Hernandez, supra,* 116 Cal.App.4th at p. 173.)  When the deputy approached the couple at about 2:00 a.m., the wife told him they wanted to go to a " 'nice hospital' " and speak with a psychiatrist.  (*Ibid.*)  When the ambulance arrived at the scene, the plaintiff and his wife entered voluntarily.  (*Ibid.*)  While in route, ambulance personnel prepared the bills for their transport, and the wife claimed she had been " 'poison[ed] by family.' "  (*Ibid.*)  The ambulance personnel felt the " 'pt [patient] 5150, but FSO [sheriff's deputy] does not.' "  (*Ibid.*)  Upon arrival at the hospital, the wife exited the ambulance, dashed away, and "made her way across one side of Highway 99, over the median barrier, and out into the roadway on the other side.  She attempted to flag down one vehicle, without success, and was then hit and killed by another."  (*Id.* at p. 174.)

The court commenced its duty analysis by observing it was not considering "the general duty of EMT's to perform their functions with due care" or "a situation in which the alleged negligence arises from a failure to perform some required aspect of an emergency medical procedure."  (*Hernandez, supra,* 116 Cal.App.4th at p. 177.)  It further observed the case did not "involve misfeasance but, instead, a failure to take positive steps to protect [the wife] from herself."  (*Ibid.*)  "Such a proposed duty has been

---

[9]  We use this term in its most generalized sense, i.e., a volitional act by the patient that results in harm to the patient.

12

labeled variously, in other similar situations, as a 'duty to prevent harm,' [citation], a 'duty to come to the aid of another' [citation], and a 'duty to take precautions' against a person's harming himself or herself in some foreseeable way." (*Ibid.*)

The court then turned to the plaintiffs' claim that there was a " 'special relationship' " between the wife and defendants "which gave rise to a duty owed by them to protect her from the harm she suffered." (*Hernandez, supra,* 116 Cal.App.4th at p. 178.) The court distinguished cases in which courts have held medical providers owed a duty to take measures to protect patients from committing suicide (*ibid.*) and cases in which courts have held law enforcement officers owed a duty of care because they undertook " 'affirmative acts' " that " 'increase[d] the risk of danger' " to the plaintiff. (*Id.* at p. 179.) It also rejected the "broad proposition" that where " 'those who accept the responsibility of caring for others learn that their charges may pose a danger to themselves, they owe a duty of reasonable care to prevent such harm,' " (*id.* at p. 178) citing to *Nally v. Grace Community Church* (1988) 47 Cal.3d 278 (*Nally*), "in which the court refused to find a special relationship between clergymen-counselors and the decedent, though the defendants had been aware of the decedent's suicidal thoughts." (*Hernandez,* at p. 178.)

The *Hernandez* court also rejected the plaintiffs' assertion that a special relationship arose by virtue of the defendants' " '[a]ffirmative act' " of " 'accepting' " the plaintiff and his wife into the ambulance with "the knowledge" the wife "was in need of medical attention" and their impression (although not the deputy's) that she was " '5150.' " (*Hernandez, supra,* 116 Cal.App.4th at p. 179.) While there was evidence the ambulance personnel were generally aware a person is detainable under 5150 when

13

" 'endangering others, endangering themselves, or gravely disabled,' " there was no evidence they believed the wife was a danger to herself or others. (*Id.* at p. 180.)

Thus, as to a special relationship, the court concluded "[n]one of the authorities cited by [the plaintiffs] support[ed] the proposition that, because they undertook to transport [the wife] to a hospital, at her request, [defendants] can be held to have undertaken also to protect her from her own suicidal, reckless or irrational subsequent conduct. Indeed, the law is to the contrary." (*Hernandez, supra,* 116 Cal.App.4th at p. 180.)

The court went on to state that even if a " 'special relationship' " existed, the *Rowland* factors led to the same result—no duty of care existed.[10] To begin with, said the court, the causal connection between the wife's death on the freeway and the ambulance personnel's conduct was "attenuated and remote." (*Hernandez, supra,* 116 Cal.App.4th at p. 180.) Of equal importance were the potential adverse consequences to the community should the court recognize the duty the plaintiffs proposed. (*Ibid.*) The court observed "both the courts and the Legislature have been loath to discourage the provision of necessary emergency services through the recognition of liability incurred in connection with them. (See, e.g., *Eastburn v. Regional Fire Protection Authority* [(2003)] 31 Cal.4th [1175,] 1183–1185, and authorities cited therein.) Recognition of the duty [the plaintiffs] suggest[ed] could subject emergency service providers to a Hobson's choice of liability for violating that

---

[10] As recent decisions of our high court make clear, the "multifactor test set forth in *Rowland* was not designed as a freestanding means of establishing duty, but instead as a means for deciding whether to limit a duty derived from other sources," such as the common law or statutory law. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 217 (*Brown*).)

14

duty or liability for wrongful detention. (See *Gonzalez v. Paradise Valley Hosp.* [(2003)] 111 Cal.App.4th [735,] 741 [' "an involuntary detention . . . without consent would arguably constitute kidnapping, false imprisonment, or battery" '].) EMT's would not be immune from liability for wrongful detention, as are those authorized to detain pursuant to section 5150. (See Welf. & Inst. Code, § 5278; see also Gov. Code, § 856.2 [public entities and employees immune from liability for injury to or death of escaping or escaped person who has been confined for mental illness].) Recognition of the suggested duty could create uncertainty and thereby deter the provision of emergency medical services to the mentally ill. Conversely, it could encourage the detention of individuals by persons not qualified or authorized by statute, and thereby contravene the policy of this state to discourage unnecessary interference with the freedom and rights of the mentally ill." (*Hernandez,* at pp. 180–181.)

Given the distinctly different circumstances in the case before us— including that plaintiff was subject to a section 5585 mental health hold, was a patient being transferred from one medical facility to another, and was injured during transport and not after arrival at and having run away from the receiving facility—our view of the special relationship prong of the duty analysis differs from that of *Hernandez.*

Indeed, we fail to see how this case is any different in character than that against any other entity or person who has provided, or assisted in providing, medical services to a patient. There is no question, for example, that a facility, provider, nurse, or technician owes a patient a general duty of due care. (See, e.g., *Weinstein v. St. Mary's Medical Center* (1997) 58 Cal.App.4th 1223, 1230 [duty of due care arises from relationship of a "medical care provider to a patient"].) Even an orderly transporting a patient

15

from one point of service to another, owes the patient a duty to act with due care. (See *Bellamy v. Appellate Department* (1996) 50 Cal.App.4th 797, 805–808 [technician's failure to set brake on rolling X-ray table and failure to hold table in place, resulting in injury to patient, constituted claim of professional negligence regardless of fact the acts that allegedly should have been performed did not require "any particular skill, training, experience or exercise of professional judgment"].)

There is also no question defendants were providing a medical support service in transporting plaintiff from one medical facility to another. In *Canister v. Emergency Ambulance Service, Inc.* (2008) 160 Cal.App.4th 388, for example, the court held that "EMT's are health care providers and negligence in operating an ambulance qualifies as professional negligence [under the Medical Injury Compensation Reform Act (MICRA)] when the EMT is rendering services that are identified with human health and for which he or she is licensed" (*id.* at p. 392), which include transporting patients. (*Id.* at p. 406.) Although the issue before the court in *Canister* was whether MICRA applied to injuries sustained by a police officer who was riding along with an arrestee being transported, the salient point here is that the court concluded EMT's are health care providers who render medical services. (*Id.* at pp. 392, 396–403; *id.*, at p. 403 ["[t]he services that EMT's provide to patients are 'inextricably identified' with the health of patients"].) As such, they, like any other provider of medical services or medical support services, owe a general duty of care to those to whom they provide such services.

*Wright v. City of L.A.* (1990) 219 Cal.App.3d 318 (*Wright*), is also instructive. In *Wright,* the plaintiffs' decedent was in a fight, sustained injuries, and then collapsed in a parked car. (*Id.* at p. 326.) The first police

16

officers to arrive at the scene dragged the victim from the car, put him on the ground, handcuffed his hands behind his back, and, according to witnesses, kicked him to the gutter. (*Id.* at p. 326.) An ambulance arrived at the scene minutes later. (*Id.* at pp. 327, 332.) Witnesses testified one of the paramedics approached the victim but did not touch him and walked away within a minute or two. (*Id.* at p. 327.) The paramedic testified he performed a visual "60 second examination," did not see signs of shock, and told officers the victim should be seen by a doctor before he was booked. (*Id.* at pp. 336–338.) The victim subsequently died of complications attributable to sickle cell anemia. (*Id.* at p. 339.) A jury found defendants, including the ambulance personnel, liable for negligently causing the victim's death. The trial court granted a motion for judgment notwithstanding the verdict on the ground the paramedic owed no duty to have foreseen sickle cell complications. The Court of Appeal reversed. (*Id.* at pp. 344, 348.)

With respect to duty, the appellate court concluded the jury had been properly instructed that a paramedic has a general duty to exercise the care and skill ordinarily used in like cases in the same or similar locality and under similar circumstances, and that a paramedic who renders emergency services at the scene of an emergency can only be liable for acts or omissions performed in a grossly negligent manner or omissions performed in bad faith." [11] (*Wright, supra,* 219 Cal.App.3d at pp. 343–344.) There is no

_____

[11] We are not asked here to decide whether the limitation on paramedic and EMT liability set forth in Health and Safety Code section 1799.106 requires plaintiff to prove defendants acted with "gross negligence" to recover damages. (Health & Saf. Code, § 1799.106, subd. (a) [emergency personnel "who render[] emergency medical services at the scene of an emergency . . . shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or . . . not performed in good faith"].) Thus, we take no position on whether transporting a patient subject to a 72-

17

indication any objection was made to these instructions. Thus, it appears there was no debate that the defendants owed a general duty to act with due care. More specifically, the appellate court stated, "paramedics arriving at a location where there has been a fight and finding a patient lying on the ground have a duty to make an examination which is sufficient to determine whether the patient has symptoms of any serious injuries which may likely result from a fight, such as shock, head injury or trauma, internal injuries or broken bones, and to treat those symptoms or take the patient to a hospital for treatment of the injury." (*Id*. at p. 346.) Notably, the court expressly declined to rule that the paramedic had a duty to anticipate certain symptomology, and specifically that arising from sickle cell anemia, a point to which we shall return.[12] (*Id*. at pp. 346–347.)

Defendants maintain *Wright* is inapplicable because it involved entirely different facts. However, the significance of *Wright* does not arise from its specific facts, but from its fundamental premise that ambulance personnel

---

hour mental health hold and in immediate need of specialized psychiatric care to ensure they do not harm others or themselves, constitutes the rendition of "emergency medical services" for purposes of Health and Safety Code section 1799.106.

[12] The appellate court prefaced its discussion of the duty owed by the paramedic with the observation that the "evidence," and specifically expert testimony as to the standard of care, "support[ed] the conclusion" that the paramedic owed the described duty. (*Wright, supra,* 219 Cal.App.3d at p. 346.) We note *Wright* was decided in 1990, and in more recent cases, our Supreme Court has made it abundantly clear that the issue of duty is a threshold question of law considered at a high level of generality, and *not* a factual determination based on varying expert opinions as to the professional standard of care and whether that standard was met. (See *Brown, supra,* 11 Cal.5th at p. 213; *Kesner, supra,* 1 Cal.5th at pp. 1143–1144; *Hernandez, supra,* 116 Cal.App.4th at pp. 175–176.)

18

owe a general duty to exercise due care in performing the medical support services they provide.

In short, we agree with plaintiff that, unlike *Hernandez,* this case *does* involve "the general duty" of an ambulance company, and of paramedics and EMT's, to "perform their functions with due care."[13] *(Hernandez, supra,* 116 Cal.App.4th at p. 177.)

As have other courts considering *only* the threshold issue of duty, we emphasize that the fact defendants owed plaintiff a general duty to act with due care does *not* set the specific standard by which defendants' conduct must be assessed. That benchmark is the professional standard of care, i.e., the care and skill that ordinarily would have been brought to bear by EMT's and paramedics at the time in question, in like cases, in the same or similar locale. (See, e.g., *Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968–969; *Hernandez, supra,* 116 Cal.App.4th at p. 176; *Kockelman v. Segal* (1998) 61 Cal.App.4th 491, 499, 505 (*Kockleman*).) The applicable professional standard of care is an altogether different issue than the threshold issue of duty, and it is an issue of fact that in nearly all cases must be established by expert testimony. (*Lattimore,* at p. 968; *Kockelman,* at p. 505.) Thus, unlike the threshold issue of duty, the parameters of the applicable professional standard of care "will necessarily vary with the facts, measured against

---

[13] As we have recited, the ambulance company has written policies governing the transport of "patients," and the stated purpose of the policy governing the use of restraints, for example, is "[t]o ensure safe transport of patients requiring physical restraint." While such written policies do not establish the existence of a duty of due care—a question of law for the court to decide—they do reflect that defendants believe they have some responsibility with respect to the safety of their patients, i.e., that they have at least a general duty to act with due care.

19

professional standards of reasonableness. [Citation.] These determinations will require expert testimony" and are outside the singular issue of duty on which defendants sought summary judgment.[14] (*Kocklelman,* at p. 499.)

Defendants' assertion that they owed no duty of care to plaintiff is based entirely on the fact that *she* unilaterally, and unexpectedly, unbuckled the safety belts, climbed off the gurney, opened the rear doors, and stepped out of the ambulance. Thus, they maintain this case comes within the general principal that a person is "ordinarily not liable for the actions of another and is under no duty to protect another from harm." (*Nally, supra,* 47 Cal.3d at p. 293.)

However, as our Supreme Court has discussed in a number of cases, there are exceptions to the no-duty-to-protect rule. (E.g., *Brown, supra,* 11 Cal.5th at pp. 213–216; *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619–629.) In *Brown,* for example, the court explained, "Generally, the 'person who has not created a peril is not liable in tort merely for failure to take affirmative action to assist or protect another' from that peril. [Citations.] . . . For example, a person who stumbles upon someone drowning generally has no legal duty to help the victim. The same rule applies to a person who stumbles upon a mugging, for 'as a general matter, there is no duty to act to protect others from the conduct of third parties.' " (*Brown,* at p. 214.) "The most commonly cited reason for the rule is rooted in 'the liberal tradition of individual freedom and autonomy'— the

---

[14] In their briefing on appeal and during oral argument the parties appeared at times to conflate the threshold issue of duty and the applicable professional standard of care. We emphasize again that these are different issues. We are concerned here only with the threshold legal issue of duty, not with the factually intensive issues of the applicable professional standard of care and whether that standard was breached.

idea that a person should be able to freely choose whether to come to the aid of a stranger, without fear of incurring legal liability for the choice." (*Id.* at p. 215.)

"The no-duty-to-protect rule is not absolute," however, and the high court "has recognized a number of exceptions," including "what the law calls a 'special relationship' with either the victim or the person who created the harm." (*Brown, supra*, 11 Cal.5th at p. 215.) "A special relationship between the defendant and the victim is one that 'gives the victim a right to expect' protection from the defendant, while a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' [Citation.] Relationships between parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests, are all examples of special relationships that give rise to an affirmative duty to protect. [Citations.] The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly." (*Id.* at p. 216.)

It is well-established that the patient-provider relationship is another example of a "special relationship." (See *Kockelman, supra,* 61 Cal.App.4th at p. 499; *Reisner v. Regents of University of California* (1995) 31 Cal.App.4th 1195, 1198.) In *Kockelman*, for example, the court, after canvassing the law on the duty owed to suicidal patients, held that a mental health provider's duty of care extends to both in and out-patients, rejecting the defendant physician's assertion that he owed no duty to an out-patient who took his own life. (*Kockelman,* at pp. 498–505.)

Thus, we have little trouble concluding that, as a provider of medical support services, defendants also have a special relationship with the

patients they transport and therefore owe these patients a general duty of care.

Nally is therefore inapposite in the instant case. In Nally, the parents of a young man who committed suicide sued the church he attended and its pastoral counselors for what the Court of Appeal termed " 'negligent failure' " by " 'nontherapist counselors' " to " 'prevent suicide.' " (Nally, supra, 47 Cal.3d at pp. 283, 290.) The Supreme Court found no support for the appellate court's "loosely phrased" and variously articulated duty (id. at p. 292), emphasizing its prior decisions involved the "limited context of hospital-patient relationships where the suicidal person died while under the care and custody of hospital physicians who were aware of the patient's unstable mental condition." (Id. at p. 294.) Those cases, said the high court, recognized "that a cause of action may exist for professional malpractice when a psychiatrist's (or hospital's) treatment of a suicidal patient falls below the standard of care for the profession." (Id. at pp. 295-296.) The circumstances in Nally, in contrast, did not involve a "supervised medical relationship," but rather a "personal or religious" counseling relationship where one person provided "nonprofessional guidance" to another and the counselor had "no control over the environment of the individual being counseled." (Id. at p. 294.) Thus, the high court's own precedent weighed against any "special relationship" in the pastoral counseling context. (Id. at p. 296.) The court went on to conclude the Rowland factors also militated against any duty on the part of nontherapist, pastoral counselors to "prevent suicide." (Id. at p. 299.) "Such a duty would necessarily be intertwined with the religious philosophy of the particular denomination or ecclesiastical teachings of the religious entity" involved, raising a host of complex policy issues inappropriate for resolution by judicial fiat. (Ibid.)

This case does not involve pastoral counselors providing religious guidance and support.  Rather, it involves trained and licensed paraprofessionals providing medical support services.  In short, it falls squarely within the category of cases the Supreme Court *distinguished* in *Nally,* i.e., cases involving medical care that allegedly fell below the applicable professional standard of care.

*Brown, supra,* 11 Cal.5th 204, and *Colonial Van & Storage, Inc. v. Superior Court* (2022) 76 Cal.App.5th 487 (*Colonial Van*), which defendants cited at oral argument, are also distinguishable.  In *Brown,* our Supreme Court considered whether the plaintiffs, young athletes who had been sexually abused by their taekwondo coach, were owed a duty of care by the United States Olympic Committee and by USA Taekwondo, the national governing body for the sport of taekwondo.  (*Brown,* at p. 210.)  The principal issue before the court was the relationship between the "special relationship doctrine" and the *Rowland* factors.  Some Courts of Appeal had held a plaintiff must first establish a special relationship and then satisfy the *Rowland* factors, other courts had held a plaintiff can establish a duty to protect against a third party's conduct by satisfying either the special relationship doctrine or the *Rowland* factors, still others had held the special relationship doctrine incorporates the *Rowland* factors.  (*Id.* at p. 212.)  The high court clarified that a plaintiff claiming the defendant owed a duty to protect against a third party's conduct must first establish that the defendant had a special relationship with either the plaintiff or the third party (*id.* at pp. 215-216) and if the plaintiff is successful in that regard, the court must then weigh the *Rowland* factors to determine if a categorical exception to a duty to protect should apply.  (*Id.* at pp. 221-222.)  The court went on to agree

with the Court of Appeal that there was no special relationship as to the Olympic Committee, but there was as to USA Taekwondo. (*Id.* at p. 222.)

In *Colonial Van*, the Court of Appeal considered whether an employer of the host of a social and networking dinner in the host's home, owed a duty to two guests (one of whom was a co-worker of the host and the other who was a business acquaintance) shot by the host's son. The son was a veteran suffering from posttraumatic stress disorder, who was receiving outpatient treatment and had a history of self-harm and misuse of firearms. (*Colonial Van, supra,* 76 Cal.App.5th at pp. 492-493.) The Court of Appeal rejected arguments that the employer sufficiently controlled the employee's home and/or derived a commercial benefit from the employee's work-related use of her home, to give rise to a duty to protect. (*Id.* at pp. 497-500.) The court also rejected the argument that an employer-employee relationship with both the host and one of the guests, established a special relationship at the time of the shooting. (*Id.* at pp. 500-501.) The court went on to explain that even if a special relationship existed, the *Rowland* factors weighed against imposing a duty to protect. Among other things, such a duty would make employers "the insurers of the safety of working-at-home employees in the event of any intentional harm, even if the employer had no reason to expect it." (*Id.* at p. 504.) The burden on employers would be extreme (and unrealistic) and the intrusion into the homes of employees would be intolerable. (*Id.* at pp. 504-505.)

Thus, both *Brown* and *Colonial Van* considered whether defendants owed a duty to protect the plaintiffs from third party criminal conduct.

That was also the case in *C.I. v. San Bernardino City Unified School District* (Aug. 10, 2022, E076212) __ Cal.App.5th ___[2022 WL 4077374] (*San Bernardino*), cited by defendants in a post-argument letter. The Court of

Appeal held neither the school district nor the school principal owed a duty to protect students and faculty from injuries caused by a teacher's estranged husband who appeared at the school, signed in at the office, and then entered his wife's classroom and shot and killed her, a student, and then himself. (*Id.* at p. *1.) The wife had never told any one at the school her husband had ever threatened her, and he had been to the campus before without incident. (*Id.* at pp. *1-2.) The school had implemented a number of safety measures pertaining to entry on the campus, but had a policy of allowing teacher spouses to enter on signing in at the front office. (*Id.* at p. *3.) It was undisputed the school district had a "special relationship" with the injured plaintiffs. (*Id.* at p. *4.) However, on examining the *Rowland* factors, the court held they weighed against a duty to protect from the kind of unforeseeable criminal conduct perpetrated by the estranged spouse. (*Id.* at pp. *5-6.) We discuss the court's *Rowland* analysis in the next section of our opinion.

In sum, none of the cases defendant has highlighted suggest there was no special relationship here given that defendants were trained and licensed paraprofessionals providing a medical support service to a patient being transported from one medical facility to another. We therefore turn to the *Rowland* factors.

### *The* Rowland *Factors Do Not Weigh in Favor of a Categorical Exception to the General Duty of Due Care*

Having concluded defendants owed plaintiff a general duty to act with due care, we next consider whether the *Rowland* factors dictate " 'carv[ing] out an entire category of cases from th[e] general duty rule' of [Civil Code] section 1714, subdivision (a)." (*Kesner, supra,* 1 Cal.5th at p. 1144, quoting *Cabral, supra,* 51 Cal.4th at p. 772; see *Brown, supra,* 11 Cal.5th at p. 222

25

["even when a special relationship gives rise to an affirmative duty to protect, a court must still consider whether the policy considerations set out in *Rowland* warrant a departure from that duty in the relevant category of cases"].)

As defendants point out, *Hernandez* concluded the *Rowland* factors weighed against a duty of care to protect the plaintiff's wife from the consequences of her unexpected flight from the ambulance on its arrival at the medical facility. (*Hernandez, supra,* 116 Cal.App.4th at pp. 180–181.) They maintain the same policy reasons that underlie the holding in *Hernandez* compel the same conclusion here.

Plaintiff asserts that is not the case, and the fundamental policy reason for the court's no-duty conclusion in *Hernandez* does not exist here, given that she was subject to a section 5585 hold and was injured while being transferred from one mental health care facility to another for more intensive care.

We agree with plaintiff that the court's principal concern in *Hernandez* was that if ambulance personnel owe a duty to physically detain a person who has summoned an ambulance to take them to a medical facility, but who, upon arrival, has a change of heart, panic attack, or some other phobic reaction to entering the facility and leaves, they face a "Hobson's choice of liability for violating that duty or liability for wrongful detention." (*Hernandez, supra,* 116 Cal.App.4th at pp. 180–181.) As the court pointed out, in such case, paramedics and EMT's "would not be immune from liability for wrongful detention, as are those authorized to detain pursuant to section 5150." (*Id.* at p. 181.) Thus, recognition of such a duty "could create uncertainty and thereby deter the provision of emergency medical services to the mentally ill. Conversely, it could encourage the detention of individuals

26

by persons not qualified or authorized by statute, and thereby contravene the policy of this state to discourage unnecessary interference with the freedom and rights of the mentally ill." (*Ibid.*)

The foregoing concern is not present here. A duly authorized person had already placed plaintiff on a section 5585 hold, which allowed her to be involuntarily detained. Thus, the ambulance personnel faced no "Hobson's choice" between keeping her within the confines of the medical transport and subjecting themselves to a claim of wrongful detention. Accordingly, concluding they owed plaintiff a general duty of due care would not deter them from providing emergency medical care or related medical support services, any more than such duty deters other health care professionals and support personnel from providing and assisting with medical care. Nor does a general duty of due care risk unnecessarily interfering with the freedom and rights of the mentally ill. By enacting the mental health hold scheme for youth, as well as for adults, the Legislature has already made the policy choice to permit such interference.

We therefore consider whether the other *Rowland* factors, " 'evaluated at a relatively broad level of factual generality' " clearly justify a " 'categorical exception' " from the ordinary duty to act with due care. (*Kesner, supra,* 1 Cal.5th at pp. 1143–1144, quoting *Cabral, supra,* 51 Cal.4th at pp. 772, 774.)

Foreseeability is the most important of these factors (*Kesner, supra,* 1 Cal.5th at p. 1145), and defendants maintain it was wholly unforeseeable that plaintiff would suddenly engage in an act of self-harm. They point to the uncontroverted evidence that plaintiff had engaged in no such behaviors during the time she was at the crisis stabilization unit, that she was transported to and from the local hospital without incident, that

27

[REDACTED TEXT], and that she was calm and cooperative at all times while she was being prepared for discharge and transfer and while she was moved into the ambulance.

"[T]he analysis of foreseeability for purposes of assessing the existence or scope of a duty is different, and more general, than it is for assessing whether any such duty was breached or whether a breach caused a plaintiff's injuries." (*Staats v. Vintner's Golf Club, LLC* (2018) 25 Cal.App.5th 826, 837 (*Staats*).) Our task " ' "is not to decide whether a particular plaintiff's injury was reasonably foreseeable in light of a particular defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." ' [Citations.] We do, however, evaluate the kind of third party conduct involved in light of all the surrounding circumstances as probative in assessing generally whether the category of [defendant's] alleged negligent conduct is sufficiently likely to result in the kind of harm plaintiffs experienced. 'What is "sufficiently likely" means what is " 'likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' " ' "[15] (*Colonial Van, supra,* 76 Cal.App.5th at p. 502, italics omitted; accord, *Kesner, supra,* 1 Cal.5th at pp. 1143–1144.)

---

[15] " 'The jury, by contrast, considers "foreseeability" in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury.' " (*Staats, supra,* 25 Cal.App.5th at p. 837, quoting *Ballard v. Uribe* (1986) 41 Cal.3d 564, 573, fn. 6; *Kesner, supra,* 1 Cal.5th at p. 1144.)

"When determining whether a particular category of harm is reasonably foreseeable, ' "it is well to remember that 'foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct.' [Citation.] One may be held accountable for creating even ' "the risk of a slight possibility of injury if a reasonably prudent [person] would not do so." ' " ' " (*Staats, supra,* 25 Cal.App.5th at p. 838, quoting *Laabs v. Southern California Edison Co.* (2009) 175 Cal.App.4th 1260, 1272.)

The parties dispute the " ' " ' "category of negligent conduct" ' " ' " (*Staats, supra,* 25 Cal.App.5th at p. 837, italics omitted) at issue here. Defendants insist this case is solely about the use of restraints and that plaintiff's negligence claim is based on defendants' failure to place her in restraints for transfer. Plaintiff maintains her negligence claim is more general and is based on a general duty to use due care in safely transporting patients. The allegations of plaintiff's complaint confirm that she has at least pleaded a negligence claim broader than the use of restraints, as she generally alleges she "was not properly cared for" by defendants, and this "lack of care included, but is not limited to, a failure to properly maintain, care for, manage, control and/or restrain" her. However, we agree with defendants that plaintiff's arguments have largely focused on a claim defendants should have used restraints and had they done so she would not have been injured, a matter to which we shall shortly return. Nevertheless, it is the allegations of the operative pleading that fix the bounds for a summary judgment motion. (See *Jameson v. Desta* (2013) 215 Cal.App.4th 1144, 1165 [defendant failed to carry his initial burden on summary adjudication by failing to address all theories of liability]; *Lona v. Citibank,*

29

*N.A.* (2011) 202 Cal.App.4th 89, 110 ["defendants failed to meet their burden on summary judgment because their motion failed to address all of the allegations of [the] second amended complaint"]; *Lopez v. Superior Court* (1996) 45 Cal.App.4th 705, 717 ["As the party moving for summary judgment, [the defendant] had the burden to show that it was entitled to judgment with respect to all theories of liability asserted by [the plaintiff]."].)

Accordingly, the asserted "category of negligent conduct" at issue here is broader than the use of restraints. It is negligent conduct in preparing and securing a patient for transport, the term "securing" being used broadly to include any and all measures to prevent the patient from suffering injury during transport, such as safety belts, shoulder harnesses, or the position and locking of the gurney. Plaintiff has argued the gurney should have had shoulder harnesses which should have been used and that the rear doors of the ambulance should have been locked—both of which would have at least slowed her effort to exit the ambulance and allowed the EMT to restrain her. Whether these claims have any merit is a factual matter beyond the scope of the summary judgment motion.

The relevant question then is whether such negligent conduct " ' " ' "is sufficiently likely to result in the kind of harm" ' " ' " (*Staats, supra,* 25 Cal.App.5th at p. 837, italics omitted) or the "particular category of harm" experienced, that liability may appropriately be imposed. (*Id*. at p. 838.) We think it " ' " 'likely enough' " ' " (*ibid.*) that negligence in securing a patient for transport may result in injury to the patient, including because of the patient's own physical movement.

As for the rest of the *Rowland* factors, none weigh clearly in favor of carving out a categorical exception from the general duty of ambulance personnel to act with due care during the transport of a patient. While we do

not attach any moral blame to defendants' conduct in a vacuum, if the trier of fact were to find them negligent, it is not unfair that they be held accountable. (See *Staats, supra,* 25 Cal.App.5th at p. 842.) The policy of preventing future harm supports imposing the cost of injuries on those tasked with exercising due care. (*Kesner, supra*, 1 Cal.5th at p. 1150 ["In general, internalizing the cost of injuries caused by a particular behavior will induce changes in that behavior to make it safer."].) And as for insurance, nothing in the record suggests it cannot be procured in a reasonable amount. (See *Staats,* at p. 842.)

The recent *San Bernardino* case does not call for a different conclusion. In considering the *Rowland* foreseeability factor, the court agreed " '[i]t is undeniable that shootings and other forms of violence can and do happen in the workplace [and on school grounds].' " But " ' "[m]ore than a mere possibility of occurrence is required since, with hindsight, everything is foreseeable." ' " (*San Bernardino, supra,* __ Cal.App.5th at p. ___, 2022 WL 4077374 at p. *5, quoting *Colonial Van, supra,* 76 Cal.App.5th at p. 503.) The case before the court, however, "presented nothing more than a ' "mere possibility of occurrence." ' " (*San Bernardino,* at p. * 5.) The plaintiffs "produced no evidence that defendants had actual knowledge that [the husband] posed a risk of harm to [his wife] or anyone at the school." (*Ibid.*) The court also pointed out the school *had* implemented numerous safety measures against entry by unknown individuals. "However, absent specific evidence to the contrary, an attack by a known, trusted visitor, such as a teacher's spouse, is speculative—at best—and not foreseeable." (*Id.* at p. *6.) In addition, there was no "causal nexus" between the district's conduct and the "third party criminal conduct." (*Ibid.*) The court also rejected the notion that a school district must suspect that any spouse presents a risk to

31

students and faculty—" 'every school would be responsible for preventing every act of domestic violence,' " an untenable proposition. (*Id.* at p. \*7.) In sum, public policy factors weighed against "imposing a duty on school districts to ensure that students are safe from third party criminal conduct of known visitors—including teacher's spouses, and students' parents and family members." (*Ibid.*) It would be an extraordinarily burdensome and "unrealistic responsibility" and an imposition of near "absolute liability," at profound economic cost to schools and unacceptably oppressive security measures on teachers and students. (*Ibid.*) And even then, " 'if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal.' " (*Id.* at p. \*8.)

As *San Bernardino* reflects, the courts have been exceedingly wary in imposing a duty to protect against unforeseen criminal conduct given the heavy burden of preventative measures. (E.g., *Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1216, 1222 [to "establish the heightened foreseeability necessary to impose a heavily burdensome duty such as hiring security guards," the plaintiff must show the existence of prior similar incidents on the premises or other sufficiently serious " 'indications of a reasonably foreseeable risk of violent criminal assaults' "; no duty to refuse to rent to or evict "gang members" and no duty to hire security guards]; *Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 246 [no duty to protect patron against unforeseeable criminal conduct, but did owe duty to respond to "unfolding" conduct "by taking reasonable, relatively simple, and minimally burdensome steps in order to address . . . imminent danger"]; *Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1195 [duty to provide protection against third party crime is determined in part by balancing the foreseeability of the harm against the burden to be imposed; no duty to hire security guards for

32

underground garage where plaintiff was raped];[16] *Ann M. v. Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 679 [violent criminal assaults were not sufficiently foreseeable to impose a duty to provide security guards in the common areas].)[17]

The case before us does not involve criminal conduct by a third party. Nor does plaintiff seek to require defendants to make highly burdensome expenditures that, given the efforts of a determined criminal, would be of dubious efficacy. We therefore cannot conclude that "allowing the possibility of liability" in cases such as this one "would result in such significant social burdens that the law should not recognize such claims." (*Kesner, supra,* 1 Cal.5th at p. 1144; *Cabral, supra,* 51 Cal.4th at p. 772.)

In reaching this conclusion, we are not suggesting in any way that plaintiff will ultimately succeed on the merits of her negligence claim. Rather, we conclude only that plaintiff has managed to clear the relatively low hurdle posed by the general duty to take reasonable measures to safely transport patients.

Let us be clear—we are *not* holding that ambulance personnel have a duty to use restraints, either "soft" or "hard," whenever a patient subject to a 5150 or 5585 hold (including a hold based on reported acts indicating a generalized risk of harm to others or self) is transported, regardless of all the other circumstances, including the attending physician's assessment of the patient's readiness for transport and decision not to order the use of restraints. Indeed, we expressly reject such a duty. (Cf. *Wright, supra,*

---

[16] Disapproved on another ground as stated in *Reid v. Google* (2010) 50 Cal.4th 512, 527, footnote 5.

[17] Disapproved on other grounds as stated in *Reid v. Google, supra,* 50 Cal.4th at page 527, footnote 5 and *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at page 853, footnote 19.

219 Cal.App.3d at pp. 346–347 [expressly rejecting the plaintiff's proposed duty].) Not only is such a duty unsupported by any legal authority, but it would run headlong into the purpose, even if not the letter, of a matrix of statutory provisions and regulations governing the use of restraints in health care facilities and by providers. Health and Safety Code section 1180.4, for example, states that an array of mental health facilities may use restraints "only when a person's behavior presents an imminent danger of serious harm to self or others." (Health & Saf. Code, § 1180.4, subd. (b).) Regulations governing psychiatric units in general acute care hospitals state restraints may be used "only on the written order of the licensed healthcare practitioner," and only "[i]n a clear case of emergency" can a registered nurse place a patient in restraints. (Cal. Code Regs. tit. 22, § 70577, subd. (j)(2).) Regulations governing acute psychiatric hospitals state restraints "shall be used only when alternative methods are not sufficient to protect the patient or others from injury," and "[p]atients shall be placed in restraint only on the written order of a licensed health care practitioner acting within the scope of his or her professional licensure" and such order "shall include the reason for restraint and the type of restraint to be used." (Cal. Code Regs. tit. 22, § 71545, subds. (a), (b).) Regulations governing skilled nursing facilities state no restraints "of any type" shall be used "as a substitute for more effective medical and nursing care" and restraints for behavior control can only be used on the signed order of a physician "except in an emergency which threatens to bring immediate injury to the patient or others." (Cal. Code Regs. tit. 22, § 72319, subds. (d) & (i)(2).) Thus, a duty to use restraints while transporting any patient subject to a section 5150 or 5585 hold, without regard to all the other attendant circumstances, would, indeed, "contravene the policy of this state to discourage unnecessary interference with the

freedom and rights of the mentally ill." (*Hernandez, supra,* 116 Cal.App.4th at p. 181.)

Given this statutory and regulatory authority, it is also clear that, contrary to plaintiff's apparent view, the professional standard of care does not, as a matter of law, require the use of restraints during the transport of any patient subject to a 5150 or 5585 hold (including a hold based on reported acts indicating a generalized risk of harm to others or self), regardless of all the other circumstances, including the attending physician's assessment of the patient's readiness for transport and decision not to order the use of restraints. In short, as plaintiff has argued the case on appeal, and in light of the record on appeal, the only claims plaintiff has advanced that have any conceivable traction are that the gurney should have had shoulder harnesses which should have been used, and the rear door of the ambulance should have been locked. As we have observed, whether these claims have any merit was not addressed by the summary judgment motion.

## DISPOSITION

The summary judgment is REVERSED and the matter returned to the trial court for further proceedings consistent with this opinion. Parties to bear their own costs on appeal.

35

_____
Banke, J.

We concur:


_____
Humes, P.J.


_____
Wiss, J.*


*Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A162508, *T.L. v. City Ambulance of Eureka*

36

Trial Court: Humboldt County Superior Court

Trial Judge: Hon. Timothy Canning

Counsel:

Esner, Chang & Boyer, Andrew Nathan Chang; Adamson Ahdoot and Christopher Adamson for Plaintiff and Appellant.

Foley & Lardner, Eileen Regina Ridley, Alan R. Ouellette, Sara Alexis Abarbanel; Porter Scott, Stephen E. Horan and David Robert Norton for Defendants and Respondents.